**EXHIBIT A**

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

**THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" FOR U.S. FEDERAL INCOME TAX PURPOSES. THE ISSUER WILL MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE: (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE, (3) THE YIELD TO MATURITY OF THE NOTE, AND (4) ANY OTHER INFORMATION REQUIRED TO BE MADE AVAILABLE BY U.S. TREASURY REGULATIONS UPON RECEIVING A WRITTEN REQUEST FOR SUCH INFORMATION AT THE FOLLOWING ADDRESS: 16-305 OLD VOLCANO ROAD, KEA'AU, HI 96749.**

**NEITHER THE ISSUANCE NOR SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES OFFERED IN CONNECTION HEREWITH HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

**Principal Amount: $1,578,947.37**                         **Issue Date: September 28, 2022**
**Purchase Price: $1,500,000**
**Original Issue Discount: $78,947.37**

## SENIOR SECURED PROMISSORY NOTE

For value received, **HSW Holdings Corporation**, a corporation organized under the laws of the state of Nevada, and **Hawaiian Springs LLC**, a limited liability company organized under the laws of the of the state of Delaware (collectively, the "**Borrower**"), hereby promises to pay to the order of **Leonite Fund I, LP**, a limited partnership organized under the laws of the State of Delaware, or registered assigns (the "**Holder**") the principal sum of up to one million five hundred seventy eight thousand nine hundred forty seven and 37/100 Dollars ($1,578,947.37) or so much as has been advanced (after giving effect to the OID (defined below)) in one or more tranches (the "**Principal Amount**"), together with interest on the Principal Amount, on the dates set forth below or upon acceleration or otherwise, as set forth herein (or as may be amended, extended, renewed and refinanced, collectively, this "**Note**"). The "**Interest Rate**" shall reset daily and accrue at an interest rate per annum, equal to the greater of (i) the Prime Rate plus thirteen and one quarter percent (13.25%), or (ii) eighteen percent (18%). The "**Prime Rate**" shall mean that variable rate of interest published from time to time by the Wall Street Journal as the prime rate of interest. In no event shall the Interest Rate exceed the maximum rate allowed by law; any interest payment which would for any reason be unlawful under applicable law shall be applied to principal.

The consideration to the Borrower for this Note is one million five hundred thousand Dollars ($1,500,000) (the "**Consideration**") to be paid in one or more tranches (each, a "**Tranche**"). The first Tranche shall consist of a payment by Holder to Borrower on the Issue Date of no less than six hundred fifty thousand Dollars ($650,000). The remainder of the Tranches shall

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

be distributed at Holder's sole discretion. Holder shall retain seventy thousand Dollars ($70,000) from the first Tranche advanced to the Borrower to cover legal and closing fees and an additional five thousand dollars ($5,000) to cover the bank fees to set up the Lockbox account pursuant to Section 3.9.1 below, provided however, that if any amount of the above referenced fees are paid by Borrower directly to Holder's counsel prior to the funding of the first Tranche, then the total amount withheld pursuant to this paragraph shall be reduced by the amount of such payment. Each Tranche advanced by Holder under this Note shall be evidenced by a flow of funds memorandum signed by the Borrower.

The maturity date ("**Maturity Date**") for each Tranche shall be at the end of the period that begins from the date each Tranche is advanced (for each Tranche, the "**Advance Date**") and ends on the three month anniversary of such Advance Date (such periods each referred to herein as a "**Tranche Term**"). The principal sum, as well as interest and other fees shall be due and payable in accordance with the payment terms set forth in Article I herein. Notwithstanding the foregoing, the Maturity Date for this Note and all Tranches advanced hereunder, shall be no later than the date upon which the Borrower completes a registered public offering of shares of the Company. Subject to Section 5.9 below, this Note may not be prepaid in whole or in part without penalty except as otherwise explicitly set forth herein.

Any amount of principal, interest, other amounts due hereunder or penalties on this Note, which is not paid by the due date as specified herein, shall bear interest at the lesser of the rate of twenty four percent (24%) per annum or the maximum legal amount permitted by law ("**Default Interest Rate**"), from the due date thereof until the same is paid in full, including following the entry of a judgment in favor of Holder ("**Default Interest**").

If any payment (other than a payment due at maturity or upon default) is not made on or before its due date, the Holder may at its discretion collect a delinquency charge equal to the greater of one hundred Dollars ($100.00) or five (5%) percent of the unpaid amount. The unpaid balances on all obligations payable by Borrower and due to Holder pursuant to the terms of this Note, shall in addition to other remedies contained herein, bear interest after default or maturity at an annual rate equal to the Default Interest rate.

Except as provided for in Section 1.2.1 below, all payments of principal and interest due hereunder shall be paid by automatic debit, wire transfer, check or in coin or currency which, at the time or times of payment, is the legal tender for public and private debts in the United States of America and shall be made at such place as Holder or the legal holder or holders of the Note may from time to time appoint in a payment invoice or otherwise in writing, and in the absence of such appointment, then at the offices of Holder at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest, then to any late charges, and then to principal. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, interest shall continue to accrue during such extension. As used in this Note, the term "**business day**" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed.

2

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

This Note carries an original issue discount of seventy eight thousand nine hundred forty seven and 37/100 Dollars ($78,947.37) (the "**OID**"), to cover the Holder's accounting fees, due diligence fees, legal, monitoring, and/or other transactional costs incurred in connection with the purchase and sale of the Note, which is included in the principal balance of this Note. Thus, the purchase price of this Note shall be one million five hundred thousand Dollars ($1,500,000), computed as follows: the Principal Amount minus the OID. The OID shall be earned upon each Tranche on a pro rata basis of their proportion of the total Consideration. (For example: upon the advance of the first Tranche, thirty four thousand two hundred ten and 53/100 Dollars ($34,210.53) shall be added to the principal amount of the outstanding Note in addition to the amount advanced, and the total amount owed, or the total principal amount, shall be six hundred eighty four thousand two hundred ten and 53/100 Dollars ($684,210.53).

It is further acknowledged and agreed that the Principal Amount owed by Borrower under this Note shall be increased by the amount of all reasonable expenses incurred by the Holder in connection with the collection of amounts due, or enforcement of any terms pursuant to, this Note. All such reasonable expenses shall be deemed added to the Principal Amount hereunder to the extent such expenses are paid or incurred by the Holder.

This Note shall be a senior secured obligation of the Borrower, with first priority over all current and future Indebtedness (as defined below) of the Borrower and any subsidiaries, whether such subsidiaries exist on the Issue Date or are created or acquired thereafter (each a "**Subsidiary**" and collectively, the "**Subsidiaries**"). The obligations of the Borrower under this Note are secured pursuant to the terms of the pledge and security agreement (the "**Security and Pledge Agreement**") of even date herewith by and between the Borrower and the Holder, terms of which are incorporated by reference and made part of this Note. With respect to any Subsidiary created or acquired subsequent to the Issue Date, Borrower agrees to cause such Subsidiary to execute any documents or agreements that would bind the Subsidiary to the terms herein and in the Related Documents (defined below).

This Note is issued by the Borrower to the Holder pursuant to the terms of that certain Securities Purchase Agreement even date herewith (the "**Purchase Agreement**" and collectively with the Security and Pledge Agreement, the "**Related Documents**"), terms of which are incorporated by reference and made part of this Note. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in the Purchase Agreement. As used herein, the term "Trading Day" means any day that the Common Shares are listed for trading or quotation on the OTC, or any other exchanges or electronic quotation systems on which the Common Shares are then traded (as defined in the Purchase Agreement).

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders or members, as applicable, of Borrower and will not impose personal liability upon the holder thereof.

In addition to the terms above, the following additional terms shall apply to this Note:

## ARTICLE I. PAYMENTS

1.1    Principal Payments. The Principal Amount of each Tranche shall be due and

3

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

payable on the Maturity Date.

     1.2     Interest Payments. Interest on this Note (i) is computed separately for each Tranche; (ii) compounds monthly (that is, for each month during each Tranche Term, the amount of accrued interest is determined by multiplying one twelfth (1/12th) of the Interest Rate by the sum of the principal amount plus any accrued and unpaid interest of such Tranche); (iii) is payable monthly (that is, the monthly interest for each Tranche shall be due on each monthly anniversary of the Advance Date of such Tranche during the Tranche Term (each such date referred to herein as the "**Monthly Interest Date**"), and in the event that accrued interest for a Tranche is determined as of a date other than a Monthly Interest Date, the amount of accrued interest shall be calculated based on one twelfth (1/12th) of the Interest Rate adjusted on a pro rata basis of the actual number of calendar days such Tranche was outstanding since the previous Monthly Interest Date, in proportion to the number of calendar days that would have elapsed from the previous Monthly Interest Date through the next Monthly Interest Date); and (iv) is guaranteed to the Holder for the entirety of each Tranche Term, without regard to an acceleration of the Maturity Date, based on the total Principal Amount of each Tranche, without regard to a reduction of the Principal Amount resulting from, without limitation, Principal Payments, or prepayment by Borrower. See Exhibit A, attached hereto, for a complete payment schedule for the first Tranche. Payment schedules for additional Tranches shall be provided upon distribution of such additional Tranches.

     1.3     Other Payment Obligations. All payments, fees, penalties, and other charges, if any, due under this Note shall be payable pursuant to the terms contained herein, but in any case, shall be payable no later than the Maturity Date.

## ARTICLE II. INTENTIONALLY OMITTED

## ARTICLE III.  RANKING, CERTAIN COVENANTS AND POST CLOSING OBLIGATIONS

     3.1     Warrants. Upon the advance of the first Tranche by Holder to the Borrower, Borrower shall issue to Holder two warrants (collectively, the "**Warrants**"), exercisable for the Borrower's common shares (the "**Common Stock**" or "**Common Shares**"), as follows:

     3.1.1    The first warrant shall be referred to as the Series A Warrants, and shall have the following terms: (1) an exercise period of 60 Months; (2) full ratchet anti-dilution protection provisions; (3) exercisable for a number of Common Shares equal to 9.99% of the number of Common Shares issued and outstanding on a fully diluted basis as of the Issue Date of this Note[1]; and (4) an exercise price equal to the value per Common Share of the Borrower issued and outstanding on a fully diluted basis as of the Issue Date of this Note, based on a valuation of the Borrower equal to five million Dollars ($5,000,000) as of the Issue Date of this Note[2]. It is expressly acknowledged and agreed by the parties that if the full Consideration is not paid by Holder to the Borrower within two (2) years of the Issue Date, then so long as no Event of Default under the Note has occurred, a pro-rata amount of Common Shares awarded under the Series A Warrants shall be recaptured by the Borrower equal to and reflecting a corresponding

---

[1] The actual number of warrant shares will be determined post closing.

[2] The actual exercise price will be determined post closing.

4

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

amount of any such non-payment as a percentage of the Purchase Price.

3.1.2    The second warrant shall be referred to as the Series B Warrants, and shall have the following terms: (1) an exercise period of 60 Months; (2) full ratchet anti-dilution protection provisions; (3) exercisable for a number of Common Shares equal to 7.99% of the number of Common Shares issued and outstanding on a fully diluted basis as of the Issue Date of this Note[1]; and (4) an exercise price equal to the value per Common Share of the Borrower issued and outstanding on a fully diluted basis as of the Issue Date of this Note, based on a valuation of the Borrower equal to ten million Dollars ($10,000,000) as of the Issue Date of this Note[2]. It is expressly acknowledged and agreed by the parties that if the full Consideration is not paid by Holder to the Borrower within two (2) years of the Issue Date, then so long as no Event of Default under the Note has occurred, a pro-rata amount of Common Shares awarded under the Series B Warrants shall be recaptured by the Borrower equal to and reflecting a corresponding amount of any such non-payment as a percentage of the Purchase Price.

3.2    Equity Interest. Upon the advance of the first Tranche by Holder to the Borrower, Borrower shall issue to Holder a number of shares of Borrower's Common Stock equal to 9.99% of the number of Common Shares issued and outstanding on a fully diluted basis as of the Issue Date of this Note[3] (the "**Equity Interest**").

3.3    Distributions on Common Shares. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on the Common Shares (or other capital securities of the Borrower) other than dividends on Common Shares solely in the form of additional Common Shares or (b) directly or indirectly or through any Subsidiary make any other payment or distribution in respect of Common Shares (or other securities representing its capital) except for distributions that comply with Section 3.7 below.

3.4    Restrictions on Variable Rate Transactions. Unless approved by the Holder, Borrower and each Subsidiary shall not enter into an agreement or amend an existing agreement to effect any sale of securities involving, or convert any securities previously issued under, a Variable Rate Transaction. The term "**Variable Rate Transaction**" means a transaction in which Borrower or any Subsidiary (i) issues or sells any convertible securities either (A) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of, or quotations for, the Common Shares at any time after the initial issuance of such convertible securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such convertible securities or upon the occurrence of specified or contingent events directly or indirectly related to the business of Borrower or the Subsidiary, as the case may be, or the market for the Common Shares, or (ii) enters into any agreement (including, without limitation, an "equity line of credit" or an "at-the-market offering") whereby Borrower or any Subsidiary may sell securities at a future determined price (other than standard and customary "preemptive" or "participation" rights). The Holder shall be entitled to obtain injunctive relief against Borrower and its Subsidiaries to preclude any such issuance, which

---

[3] The number of equity interest shares will be determined post closing.

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

remedy shall be in addition to any right to collect damages.

3.5    Restrictions on Other Certain Transactions. So long as the Borrower shall have any obligation under this Note and unless approved in writing by the Holder (which such approval not to be unreasonably withheld), the Borrower shall not directly or indirectly: (a) change the nature of its business; (b) sell, divest, change the structure of any material assets of the Borrower or any Subsidiary other than in the ordinary course of business (c) accept Merchant-Cash-Advances in which it sells future receivables at a discount, any other factoring transactions, or similar financing instruments or financing transactions; or (d) Enter into a borrowing arrangement where the Company pays an effective APR greater than 20%.

3.6    Restriction on Common Share Repurchases. So long as the Borrower shall have any obligation under this Note, Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any Common Shares (or other securities representing its capital) of Borrower or any warrants, rights or options to purchase or acquire any such shares; except for the repurchase of shares at a nominal price in connection with rights under an agreement with an employee or consultant of the Borrower whose shares have been forfeited as a result of such employee or consultant's ceasing to provide services to the Borrower.

3.7    Payments from Future Funding Sources. The Borrower shall pay to the Holder on an accelerated basis, any outstanding Principal Amount of the Note, along with all unpaid interest, and fees and penalties, if any, from the sources of capital below, at the Holder's discretion, it being acknowledged and agreed by Holder that Borrower shall have the right (without having to make such payments to Holder as aforesaid) to make *bona fide* payments to vendors with Common Shares:

3.7.1    Future Financing Proceeds – one hundred percent (100%) of the net cash proceeds of any future financings by Borrower or any Subsidiary, whether debt or equity, or any other financing proceeds such as cash advances; *provided, however,* that this provision is not applicable if the transaction generating the future financing proceeds has a specific use of proceeds requirement that such proceeds are to be used exclusively to purchase the assets or equity of an unaffiliated business in an arm's length transaction and the proceeds are used accordingly.

3.7.2    Other Future Receipts – one hundred percent (100%) of the net proceeds to the Borrower or Subsidiary resulting from the sale of any assets or securities, of Borrower or any of its Subsidiaries, including but not limited to, the sale of any Subsidiary, the sale by Borrower or any of its Subsidiaries of any tax credits, collections by Borrower or any of its Subsidiaries pursuant to any settlement or judgment, but not including sales of inventory or services of the Borrower or its Subsidiaries in the ordinary course of business.

3.8    Use of Proceeds. Borrower agrees to use the proceeds of the first Tranche advanced under the Note as follows: four hundred thousand dollars ($400,000) shall be used to purchase inventory and the remainder shall be used for general working capital. Unless approved in advance by the Holder in writing, Borrower is prohibited from using the proceeds of any Tranche advanced under this Note to repay debt.

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

3.9    Ranking and Security. The obligations of the Borrower under this Note shall constitute a first priority security interest and rank senior with respect to any and all Indebtedness existing prior to or incurred as of or following the initial Issue Date. The obligations of the Borrower under this Note are secured pursuant to the Security and Pledge Agreement attached hereto. So long as the Borrower shall have any obligation under this Note, the Borrower shall not (directly or indirectly through any Subsidiary or affiliate) incur or suffer to exist or guarantee any Indebtedness that is senior to or *pari passu* with (in priority of payment and performance) the Borrower's obligations hereunder. As used herein, the term "**Indebtedness**" means (a) all indebtedness of the Borrower for borrowed money or for the deferred purchase price of property or services, including any type of letters of credit, but not including deferred purchase price obligations in place as of the Issue Date or obligations to trade creditors incurred in the ordinary course of business, (b) all obligations of the Borrower evidenced by notes, bonds, debentures or other similar instruments, (c) purchase money indebtedness hereafter incurred by the Borrower to finance the purchase of fixed or capital assets, including all capital lease obligations of the Borrower which do not exceed the purchase price of the assets funded, (d) all guarantee obligations of the Borrower in respect of obligations of the kind referred to in clauses (a) through (c) above that the Borrower would not be permitted to incur or enter into, and (e) all obligations of the kind referred to in clauses (a) through (d) above that the Borrower is not permitted to incur or enter into that are secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured and/or unsecured by) any lien or encumbrance on property (including accounts and contract rights) owned by the Borrower, whether or not the Borrower has assumed or become liable for the payment of such obligation. With respect to any Indebtedness that is a senior secured obligation of the Borrower, Borrower agrees to cause the holders of such Indebtedness to execute subordination agreements with respect to the Borrower's obligations under this Note, and to deliver such subordination agreements to the Holder on or prior to the Issue Date.

3.9.1    Assignment of Receivables and Lockbox Agreement. So long as this Note is outstanding, the Holder may in its sole discretion, require Borrower to cause is debtors, customers, or any other party that is due to make a payment to the Borrower, regardless of whether such payment is due by contract, or otherwise, and regardless of whether such expected payment has been recorded in the books of the Borrower as a trade receivable, accounts receivable, or otherwise, to make such payment to a bank account governed by a Lock Box Agreement and/or subject to a Control Agreement, in accordance with a form and execution as determined by and satisfactory to, the Holder. Additionally, Holder may in its sole discretion require Borrower to make an assignment to Holder of any of the payments, contracts, receivables and/or other agreements, referenced in this Section 3.91.

3.9.2    Information Rights with Respect to Borrower's Bank Accounts. So long as this Note is outstanding, the Holder may in its sole discretion, require Borrower to provide Holder with viewer access to any bank account used by the Borrower even if such bank account is not in the name of the Borrower. Holder shall have the right to require use of a third party technology platform, to obtain the access required under this Section 3.9.2.

3.10    Right of Participation. During the period beginning on the Issue Date, and ending on the later of (i) eighteen (18) months following the Issue Date or (ii) the date that the balance due under this Note is paid in full, in the event Borrower or any Subsidiary of the Borrower,

7

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

proposes to offer and sell its securities, whether debt, equity, or any other financing transaction (each a "**Future Offering**"), the Holder shall have the right, but not the obligation, to participate in the purchase of the securities being offered in such Future Offering up to an amount equal to one hundred percent (100%) of the maximum Principal Amount of this Note.

3.11     Right of First Refusal. During the period beginning on the Issue Date, and ending on the later of (i) eighteen (18) months following the Issue Date or (ii) the date that the balance due under this Note is paid in full, in the event the Borrower or any Subsidiary has a bona fide offer of capital or financing from any third party that the Borrower or any Subsidiary intends to act upon, then the Borrower must first offer such opportunity to the Holder to provide such capital or financing to the Borrower or Subsidiary on the same terms as each respective third party's terms. Should the Holder be unwilling or unable to provide such capital or financing to the Borrower or Subsidiary within 10 Trading Days from Holder's receipt of written notice of the offer (the "**Offer Notice**") from the Borrower, then the Borrower or Subsidiary may obtain such capital or financing from that respective third party upon the exact same terms and conditions offered by the Borrower to the Holder, which transaction must be completed within 60 days after the date of the Offer Notice. If the Borrower or Subsidiary does not receive the capital or financing from the respective 3rd party within 60 days after the date of the respective Offer Notice, then the Borrower must again offer the capital or financing opportunity to the Holder as described above, and the process detailed above shall be repeated. The Offer Notice must be sent via electronic mail to avi@leonitecap.com; cc: dberger@bergerlawpllc.com, bernard@leonitecap.com.

3.12     Terms of Future Financings. So long as this Note is outstanding, upon any issuance of (or announcement of intent to effect an issuance of) any security, or amendment to (or announcement of intent to effect an amendment to) any security that was originally issued before the Issue Date, by the Borrower or any Subsidiary, with any term that the Holder reasonably believes is more favorable to the holder of such security or with a term in favor of the holder of such security that the Holder reasonably believes was not similarly provided to the Holder in this Note, then (i) the Borrower shall notify the Holder of such additional or more favorable term within five (5) business days of the issuance and/or amendment (as applicable) of the respective security, and (ii) such term, at Holder's option, shall become a part of the transaction documents with the Holder (regardless of whether the Borrower complied with the notification provision of this Section 3.12). The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion lookback periods, interest rates, original issue discounts, stock sale price, private placement price per share, and warrant coverage. If Holder elects to have the term become a part of the transaction documents with the Holder, then the Borrower shall immediately deliver acknowledgment of such adjustment in form and substance reasonably satisfactory to the Holder (the "Acknowledgment") within three (3) business days of Borrower's receipt of request from Holder (the "Adjustment Deadline"), provided that Borrower's failure to timely provide the Acknowledgement shall not affect the automatic amendments contemplated hereby.

3.13     Registration Rights. Holder shall have registration rights pursuant to Section 5.6 of the Purchase Agreement.

3.14     Rollover Rights. So long as the Note is outstanding, if the Borrower completes any single public offering or private placement of its equity, equity-linked or debt securities (each, a

8

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

"**Future Transaction**"), the Holder may, in its sole discretion, elect to apply as purchase consideration for such Future Transaction: (i) all, or any portion, of the then outstanding principal amount of the Note and any accrued but unpaid interest, including any amounts that would be added to the principal outstanding in the event that any redemption right or prepayment right is exercised by either the Holder or the Borrower, and (ii) any securities of the Borrower then held by the Holder, at their fair value (the "**Rollover Rights**"). The Borrower shall give written notice to Holder as soon as practicable, but in no event less than fifteen (15) days before the anticipated closing date of such Future Transaction. The Holder may exercise its Rollover Rights by providing the Borrower written notice of such exercise within five Business Days before the closing of the Future Transaction. In the event Holder exercises its Rollover Rights, then such elected portion with respect to (i) and (ii) above, shall automatically convert into the corresponding securities issued in such Future Transaction under the terms of such Future Transaction, such that the Holder will receive all securities (including, without limitation, any warrants) issuable under the Future Transaction. The conversion price applicable to such conversion shall equal sixty percent (60%) of the cash purchase price paid per share, unit, or other security denomination for the Borrower securities issued in the Future Transaction to other investors in the Future Transaction.

3.15    Exchange Act Reporting. Upon the Borrower becoming an SEC reporting company subject to the requirements of the Exchange Act, Borrower shall be required to remain a fully reporting company under the SEC reporting requirements and remain subject to and fully compliant with, the annual and periodic reporting requirements of the Exchange Act (including but not limited to becoming current in its filings). Failure to remain a fully reporting company and subject to and compliant with the Exchange Act as described herein, (including but not limited to becoming delinquent in its filings), shall be an Event of Default (as defined below) under Section 4.1.9.

3.16    Intentionally Omitted.

3.17    Concerning the Common Shares. The Common Shares issuable pursuant to this Note or the Warrants may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the Securities Act or (ii) such shares are sold or transferred pursuant to Rule 144 under the Act (or a successor rule) ("**Rule 144**"), or any other exemption from registration, or (iii) such shares are transferred to an "**affiliate**" (as defined in Rule 144) of Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 3.17 and who is an Accredited Investor. Except as otherwise provided (and subject to the removal provisions set forth below), until such time as the Common Shares issuable pursuant to this Note and the Warrants have been registered under the Securities Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for Common Shares issuable pursuant to this Note and the Warrants that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

> NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED

9

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

**(I) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT, OR ANY OTHER EXEMPTION FROM REGISTRATION. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

The legend set forth above shall be removed and Borrower shall issue to the Holder a new certificate therefor free of any transfer legend if (i) Borrower or its transfer agent shall have received an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Common Shares may be made without registration under the Securities Act, which opinion shall be accepted by Borrower (which acceptance shall be subject to and conditioned on any requirements, if any, of the its transfer agent, the exchange on which Borrower is then trading or other applicable laws, rules or regulations) so that the sale or transfer is effected or (ii) such security is registered for sale by the Holder under an effective registration statement filed under the Securities Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold. In the event that Borrower does not accept the opinion of counsel provided by the Holder with respect to the transfer of Common Shares pursuant to an exemption from registration, such as Rule 144 or Regulation S, it will be considered an Event of Default pursuant to Section 4.1.2 of the Note; provided that notwithstanding the foregoing, if Borrower is legally unable to accept such opinion as a result of any of Borrower's transfer agent requirements, the requirements of the exchange on which Borrower is then traded, or other applicable laws, rules or regulations, Borrower's nonacceptance shall instead be an Event of Default pursuant to Section 4.1.24 of the Note.

3.18    Authorized Shares. Borrower covenants that so long as the Warrants are outstanding, Borrower will reserve from its authorized and unissued Common Shares a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Shares upon the exercise of the Warrants. Borrower is required at all times to have authorized and reserved seven (7) times the number of shares that is actually issuable upon full exercise of the Warrants (based on the Exercise Price (as defined in the Warrants) of the Warrants in effect from time to time, which, if cannot be determined, shall be estimated in good faith by Borrower) (the "**Reserved Amount**"). The Reserved Amount shall be increased from time to time in accordance with Borrower's obligations hereunder. Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. In addition, if Borrower shall issue any securities or make any change to its capital structure which would change the number of Common Shares into which the Warrants shall be exercisable at the then current Exercise Price, Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of Common Shares authorized and reserved, free from preemptive rights, for exercise of the outstanding Warrants, including but not limited to authorizing additional shares or effectuating a reverse split. Borrower (i) acknowledges that upon engagement with a transfer agent, it will immediately irrevocably instruct such transfer agent by letter, the form of which is attached hereto as Exhibit B (the "**TA Letter**") to issue certificates for the Common Shares issuable pursuant to this Note and exercise of the Warrants, and (ii) agrees that its issuance of this Note shall constitute

10

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

full authority to its officers and agents who are charged with the duty of executing Common Share certificates to execute and issue the necessary certificates for Common Shares in accordance with the terms and conditions of this Note and the Warrants. Borrower further covenants that so long as any obligation under this Note or the Warrants remains outstanding, Borrower will not establish a reserve of its Common Shares for the benefit of any party other than the Holder, without prior approval in writing by Holder. Failure by Borrower to maintain the Reserved Amount, or the failure by Borrower to obtain an executed TA Letter upon engagement with a transfer agent, or the establishment of a reserve without prior approval as required above, will be considered an Event of Default under Section 4.1.2 of the Note.

## ARTICLE IV. EVENTS OF DEFAULT

4.1     It shall be considered an event of default if any of the following events listed in this Article IV (each, an "Event of Default") shall occur:

4.1.1   Failure to Pay Principal or Interest. The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity, upon acceleration or otherwise. A five (5) business day cure period shall apply for failure to make a payment when due except where payments are noted herein as being due immediately or for payments due on the Maturity Date of any Tranche which in each case shall have no cure period.

4.1.2   Failure to Reserve Shares.

(a)     Borrower fails to reserve a sufficient amount of Common Shares as required under the terms of this Note (including the requirements of Section 2.3 of this Note), fails to issue Common Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the exercise rights of the Holder in accordance with the terms of the Warrants, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) Common Shares issued to the Holder pursuant to this Note and the Warrants as and when required by this Note and the Warrants, Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) Common Shares to be issued to the Holder pursuant to this Note and the Warrants as and when required by this Note and the Warrants, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any Common Shares issued to the Holder upon pursuant to this Note and the Warrants as and when required by this Note and the Warrants (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph), and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Exercise or an issuance notice executed by the Borrower. It is an obligation of Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if an issuance pursuant to this Note or the Warrants is delayed, hindered or frustrated due to a balance owed by Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to Borrower's transfer agent in order to process an issuance, such advanced funds shall be paid by Borrower to the Holder within five (5) business days of a demand from the Holder, either in cash or as an addition to the outstanding

11

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

Principal Amount of the Note, and such choice of payment method is at the discretion of Holder.

(b)    Borrower establishes a reserve of its Common Shares for the benefit of a party other than the Holder, without obtaining prior approval in writing by the Holder.

(c)    Intentionally Omitted.

4.1.3    Breach of Covenants. Borrower, or the relevant related party, as the case may be, breaches any material covenant, post-closing obligation or other material term or condition contained in this Note, or in the related Warrants, Purchase Agreement, Security and Pledge Agreement or any other collateral documents (together, the "Transaction Documents") and breach continues for a period of ten (10) days.

4.1.4    Breach of Representations and Warranties. Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given pursuant hereto or in connection herewith, shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) an effect on the rights of the Holder with respect to this Note and the other Transaction Documents.

4.1.5    Receiver or Trustee. Borrower or any subsidiary of Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

4.1.6    Judgments or Settlements. (i) Any money judgment, writ or similar process shall be entered or filed against Borrower or any subsidiary of Borrower or any of its property or other assets for more than $25,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder; or (ii) the settlement of any claim or litigation, creating an obligation on the Borrower in amount over $25,000.

4.1.7    Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against Borrower or any subsidiary of Borrower. With respect to any such proceedings that are involuntary, Borrower shall have a 45 day cure period in which to have such involuntary proceedings dismissed.

4.1.8    Delisting of Common Shares. If at any time on or after the date in which Borrower's Common Shares are listed or quoted on the OTC Pink or an equivalent U.S. replacement exchange, the Nasdaq Global Market, the Nasdaq Capital Market, the New York Stock Exchange, or the NYSE MKT (a "Listing Event"), Borrower shall fail to maintain the listing or quotation of the Ordinary Shares, or if its shares have been suspended from trading on the OTC Pink or a U.S. equivalent replacement exchange, the Nasdaq Global Market, the Nasdaq Capital Market, the New York Stock Exchange, or the NYSE MKT, including being listed or quoted under OTC Expert Markets, and breach continues for a period of ten (10) days.

4.1.9    Failure to Comply with the Exchange Act. At any point after the date on which the Borrower becomes fully compliant with the Exchange Act, Borrower shall fail to be fully compliant with, or ceases to be subject to, the reporting requirements of the Exchange Act

12

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

(including but not limited to becoming delinquent in its filings).

4.1.10 <u>Change of Control; Liquidation</u>. (a) Any Change of Control (defined below) of the Borrower, so long as any portion of the Note is outstanding, or (b) the dissolution, liquidation, or winding up of Borrower or any substantial portion of its business. As used <u>herein</u>, a "Change of Control" shall be deemed to occur upon the consummation of any of the following events: (a) any person or persons acting together which would constitute a "group" for purposes of Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (other than the Borrower or any subsidiary of the Borrower) shall beneficially own (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, at least 25% of the total voting power of all classes of capital stock of the Borrower entitled to vote generally in the election of the Board; (b) Current Directors (as herein defined) shall cease for any reason to constitute at least a majority of the members of the Board (for this purpose, a "Current Director" shall mean any member of the Board as of the date hereof and any successor of a Current Director whose election, or nomination for election by the Borrower's shareholders, was approved by at least a majority of the Current Directors then on the Board); (c) (i) the complete liquidation of the Borrower or (ii) the merger or consolidation of the Borrower, other than a merger or consolidation in which (x) the holders of the common stock of the Borrower immediately prior to the consolidation or merger have, directly or indirectly, at least a majority of the common stock of the continuing or surviving corporation immediately after such consolidation or merger or (y) the Board immediately prior to the merger or consolidation would, immediately after the merger or consolidation, constitute a majority of the board of directors of the continuing or surviving corporation, which liquidation, merger or consolidation has been approved by the shareholders of the Borrower; (d) the sale or other disposition (in one transaction or a series of transactions) of all or substantially all of the assets of the Borrower pursuant to an agreement (or agreements) which has (have) been approved by the shareholders of the Borrower; or (e) the appointment of a new chief executive officer.

4.1.11 <u>Cessation of Operations</u>. Any cessation of operations by the Borrower or the Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

4.1.12 <u>Maintenance of Assets</u>. The failure by Borrower to maintain any intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future), to the extent that such failure would result in a material adverse condition or material adverse change in or affecting the business operations, properties or financial condition of Borrower or any of its subsidiaries (a "Material Adverse Effect").

4.1.13 <u>Financial Statement Restatement</u>. Borrower restates any financial statements for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note.

4.1.14 <u>Failure to Execute Transaction Documents or Complete the Transaction</u>. The failure of the Borrower to execute any of the Transaction Documents or to complete the transaction for the full Principal Amount of the Note, as contemplated by the Purchase Agreement.

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

4.1.15 Illegality. Any court of competent jurisdiction issues an order declaring this Note, any of the other Transaction Documents or any provision hereunder or thereunder to be illegal, as long as such declaration was not the result of an act of negligence by the Holder, exclusive of the execution of the Transaction Documents or the transactions and acts contemplated herein.

4.1.16 Intentionally Omitted.

4.1.17 Certain Transactions. Borrower enters into certain transactions prohibited by Sections 3.3, 3.4, 3.5, and 3.6 of this Agreement.

4.1.18 Reverse Splits. The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

4.1.19 Replacement of Transfer Agent. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

4.1.20 DTC "Chill". At any time on or after a Listing Event, the DTC places a "chill" (i.e., a restriction placed by DTC on one or more of DTC's services, such as limiting a DTC participant's ability to make a deposit or withdrawal of the security at DTC) on any of the Borrower's securities.

4.1.21 DWAC Eligibility. At any time on or after a Listing Event, in addition to the Event of Default in Section 4.1.20, the Common Stock is otherwise not eligible for trading through the DTC's Fast Automated Securities Transfer or Deposit/Withdrawal at Custodian programs, or if the Borrower is not registered with DTC on the Issue Date, Borrower fails to become DTC registered within 30 days of the Issue Date.

4.1.22 Bid Price. At any time on or after a Listing Event, the Borrower shall lose the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2) and/or a market (including the OTC Pink, OTCQB or an equivalent replacement marketplace or exchange).

4.1.23 Inside Information. If at any time on or after a Listing Event the Borrower or its officers, directors, and/or affiliates transmit, convey, disclose material non-public information concerning the Borrower to the Holder or its successors and assigns without knowledge or permission, which is not promptly cured by Borrower's filing of a Form 8-K pursuant to Regulation FD on that same date.

4.1.1    Unavailability of Rule 144. If, at any time on or after the date which is six (6) months from a Listing Event, the Holder is unable to (i) obtain a standard "144 legal opinion letter" from an attorney reasonably acceptable to the Holder, the Holder's brokerage firm (and respective clearing firm), and the Borrower's transfer agent, in order to facilitate the issuance to the Holder of the Borrower's Common Stock issued pursuant to this Note and the Warrants, as

14

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

free trading shares pursuant to Rule 144, and/or (ii) thereupon deposit such shares into the Holder's brokerage account.

4.1.2    Failure of Security Interest. (a) Any material provision of the Security and Pledge Agreement shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Borrower or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Borrower or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Borrower or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under the Security and Pledge Agreement; (b) the Security and Pledge Agreement, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Holder on any collateral purported to be covered thereby.

4.1.3    Cross-Default. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the other financial instrument, including but not limited to all promissory notes, currently issued, or hereafter issued, by the Borrower, to the Holder or any other third party (the "**Other Agreements**"), after the passage of all applicable notice and cure or grace periods, that results in a Material Adverse Effect shall, at the option of the Holder, be considered a default under this Note, in which event the Holder shall be entitled to apply all rights and remedies of the Holder under the terms of this Note by reason of a default under said Other Agreement or hereunder.

4.2    Remedies Upon Default.

4.2.1    Upon the occurrence of any Event of Default specified in this Article IV (and after any applicable cure period expires), in addition to and without limitation of other remedies set forth herein in this Note, (i) interest shall accrue at the Default Interest rate; (ii) this Note shall become immediately due and payable, all without demand, presentment or notice, all of which are hereby expressly waived by the Borrower, and the Borrower shall pay to the Holder, an amount (the "**Default Amount**") equal to the Principal Amount then outstanding (including Liquidating Damages and Monitoring Fees, each defined below) plus accrued and unpaid interest through the date of the Event of Default, unaccrued interest through the remainder of the Tranche Terms, together with all costs, including, without limitation, legal fees and expenses of collection, and Default Interest through the date of full repayment of the amounts due hereunder, including following the entry of a judgment in favor of Holder; and (iii) a liquidated damages charge equal to 25% of the outstanding balance due under the Note ("Liquidating Damages") will be assessed and will become immediately due and payable to the Holder, either in form of a cash payment or as an addition to the Principal Amount due under the Note. In addition, the Holder shall be entitled to exercise all other rights and remedies available at law or in equity, including, without limitation, those set forth in the Related Documents.

4.2.2    Upon the occurrence and during the continuation of an Event of Default, Borrower shall incur a monthly monitoring fee ("Monitoring Fee") in the amount of ten thousand Dollars ($10,000) per month commencing in the month in which the Event of Default occurs and

15

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

continuing until the Event of Default is cured in order to cover the Holder's costs of monitoring and legal expenses and other expenses incurred by Holder.

4.2.3    Upon the occurrence and during the continuation of an Event of Default specified in Article 4 of this Note (after the expiration of any applicable cure period), and in addition to any other right or remedy of the Holder hereunder, under the Purchase Agreement or otherwise at law or in equity, the Borrower hereby irrevocably authorizes and empowers Holder or its legal counsel, each as the Borrower's attorney-in-fact, to appear *ex parte* and without notice to the Borrower to confess judgment against the Borrower for the unpaid amount of this Note as evidenced by the Affidavit of Confession of Judgment signed by the Borrower as of the Issue Date and to be completed by the Holder or its counsel pursuant to the foregoing power of attorney (which power is coupled with an interest), a copy of which is attached as Exhibit C hereto (the "Affidavit"). The Affidavit shall set forth the amount then due hereunder, plus attorney's fees and cost of suit, and to release all errors, and waive all rights of appeal. If properly exercised by Holder, the Borrower waives the right to contest Holder's rights under this Article IV, including without limitation the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect.  No single exercise of the foregoing right and power to confess judgment will be deemed to exhaust such power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, and such power shall continue undiminished and may be exercised from time to time as the Holder may elect until all amounts owing on this Note have been paid in full.

## ARTICLE V. MISCELLANEOUS

5.1    Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

5.2    Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery, upon electronic mail delivery, or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

If to the Borrower, to:

HSW Holdings Corporation

16

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

> 16-305 Old Volcano Road
> Kea'au, HI 96749
> e-mail: l.cohen@hawaiianspringswater.com
> cc: d.moore@hawaiianspringswater.com; BairdFogel@eversheds-sutherland.us

If to the Holder:

> Leonite Fund I, LP
> 1 Hillcrest Center Dr., Suite 232
> Spring Valley, NY 10977
> Attn: Avi Geller
> e-mail: avi@leonitecap.com
> cc: Bernard@leonitecap.com; jake@leonitecap.com; dberger@bergerlawpllc.com

5.3    Amendments. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "**Note**" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

5.4    Assignability. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an "accredited investor" (as defined in Rule 501(a) of the Securities Act).

5.5    Cost of Collection. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof reasonable costs of collection, including attorneys' fees. Such amounts spent by Holder shall be added to the Principal Amount of the Note at the time of such expenditure.

5.6    Governing Law. This Note shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state and/or federal courts located in Delaware. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **EACH OF HOLDER AND THE BORROWER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY**. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other Transaction Documents by mailing

17

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. All transactions contemplated herein are being made subject to the rules of Iska as found on Leonite's website (Leonitecap.com/iska).

5.7     Certain Amounts. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding principal amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty.

5.8     Remedies. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

5.9     Prepayment. Unless an Event of Default shall occur, Borrower shall have the right at any time prior to the Maturity Date, upon thirty (30) days' notice to the Holder (the "Prepayment Notice"), to prepay the Note by making a payment to Lender equal to 110% multiplied by the sum of (i) the outstanding Principal Amount, (ii) all accrued and unpaid interest, (iii) all unaccrued interest through the remainder of the Tranche Terms that is guaranteed pursuant to Section 1.2 above, and (iv) any other amounts due under the Note (the "Prepayment Amount"). The Prepayment Notice must be received by Holder no later than 30 days prior to the date that Borrower proposes to remit the Prepayment Amount (the "Prepayment Date").

5.10    Usury. To the extent it may lawfully do so, the Borrower hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this Note. Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Borrower under this Note for payments which under Delaware law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "**Maximum Rate**"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under Delaware law in the nature of interest that the Borrower may be obligated to pay under this Note exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by Delaware law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate

18

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Borrower to the Holder with respect to indebtedness evidenced by this Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Borrower, the manner of handling such excess to be at the Holder's election.

5.11    Section 3(a)(10) Transactions. If at any time while this Note is outstanding, the Borrower enters into a transaction structured in accordance with, based upon, or related or pursuant to, in whole or in part, Section 3(a)(10) of the Securities Act, then a liquidated damages charge of 25% of the outstanding principal balance of this Note at that time, will be assessed and will become immediately due and payable to the Holder, either in the form of cash payment or as an addition to the balance of the Note, as determined by mutual agreement of the Borrower and Holder.

5.12    No Broker-Dealer Acknowledgement. Absent a final adjudication from a court of competent jurisdiction stating otherwise, so long as any obligation of Borrower under this Note or the other Transaction Documents is outstanding, the Company shall not state, claim, allege, or in any way assert to any person, institution, or entity, that Holder is currently, ever has been, has acted as, or is required to register as a broker-dealer under the Exchange Act.

5.13    Opportunity to Consult with Counsel. The Borrower represents and acknowledges that it has been provided with the opportunity to discuss and review the terms of this Note and the other Transaction Documents with its counsel before signing it and that it is freely and voluntarily signing the Transaction Documents in exchange for the benefits provided herein. In light of this, the Borrower will not contest the validity of Transaction Documents and the transactions contemplated therein. The Borrower further represents and acknowledges that it has been provided a reasonable period of time within which to review the terms of the Transaction Documents.

5.14    Confession of Judgment. As a condition precedent to Holder's obligations under this Note, Borrower shall have delivered to Holder confessions of judgment executed by the Borrower in form and substance satisfactory to Holder. Borrower represents acknowledges that Holder is advancing the Purchase Price hereunder, only on condition of receiving the foregoing.

*[signature page to follow]*

19

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer this September 28, 2022.

**HSW Holdings Corporation**

By: _____
Name: Duane Moore
Title: President


**Hawaiian Springs LLC**
**By its Managing Member, HSW Holdings Corporation**

By: _____
Name: Duane Moore
Title: President


[*Signature Page to Note*]

20

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

## EXHIBIT A – PAYMENT SCHEDULE FOR THE FIRST TRANCHE

| Date | Interest Payment | Principal Payment | Total Payment |
|---|---|---|---|
| 9/28/2022* | | | - |
| 10/28/2022 | $ 10,263.16 | | $ 10,263.16 |
| 11/28/2022 | $ 10,263.16 | | $ 10,263.16 |
| 12/28/2022 | $ 10,263.16 | $ 684,210.53 | $ 694,473.68 |

* Date of Advance of 1st Tranche

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

**EXHIBIT B – FORM OF TRANSFER AGENT INSTRUCTION LETTER**

**(See Attached)**

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

# EXHIBIT C – FORM OF AFFIDAVIT OF CONFESSION OF JUDGMENT

**(See Attached)**

**EXHIBIT B**

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

## PLEDGE AND SECURITY AGREEMENT

This PLEDGE AND SECURITY AGREEMENT (the "**Agreement**") is made and entered into on September 28, 2022, by and between **HSW HOLDINGS CORPORATION**, a corporation organized under the laws of the State of Nevada, and **Hawaiian Springs LLC**, a limited liability company organized under the laws of the of the state of Delaware (collectively, the "**Debtor**") and **LEONITE FUND I, LP**, a limited partnership organized under the laws of the State of Delaware, and its permitted endorsees, transferees and assigns (collectively, the "**Secured Party**").

### RECITALS

A.     Concurrently herewith, Debtor and the Secured Party have entered into a Securities Purchase Agreement (the "**Securities Purchase Agreement**") and certain other agreements, pursuant to which the Debtor issued that certain senior secured promissory note (the "**Note**") in the principal amount of up to one million five hundred seventy eight thousand nine hundred forty seven and 37/100 Dollars ($1,578,947.37) to the Secured Party.

B.     The Debtor now enters into this Agreement with the Secured Party as security for Debtor's Obligations (as defined below).

### AGREEMENT

NOW, THEREFORE, in consideration of their respective promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     **Definitions**. Terms used but not otherwise defined in this Agreement that are defined in Article 9 of the Uniform Commercial Code as adopted in the state of Delaware (the "**UCC**") (such as "**account**," "**adverse claim**," "**chattel paper**," "**deposit account**," "**document**," "**equipment**," "**fixtures**," "**general intangibles**," "**goods**," "**instruments**," "**inventory**," "**investment property**," "**proceeds**," and "**supporting obligations**") shall have the respective meanings given such terms in Article 9 of the UCC. Capitalized terms used in this Agreement and not defined elsewhere herein or in the Securities Purchase Agreement shall have the meanings set forth below:

"*Collateral*" means all of the collateral identified on Exhibit A hereto.

"*Debtor's Books*" means and includes all of Debtor's books and records in any medium or form, including, but not limited to, all records, ledgers and computer programs, disk or tape files, thumb drives, material stored in the "cloud," printouts and other information indicating, summarizing or evidencing the Collateral.

"*Equity Interests*" means, with respect to any person, all of the shares of capital stock of (or other ownership or profit interests in) such person, all of the warrants, options or other rights for the purchase or acquisition from such person of shares of capital stock of (or other ownership or profit interests in) such person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such person or warrants, rights or

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

options for the purchase or acquisition from such person of such shares (or such other interests), and all of the other ownership or profit interests in such person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

*"Event of Default"* has the meaning specified in Section 6 of this Agreement.

*"Negotiable Collateral"* means and includes all of Debtor's presently existing and hereafter acquired or arising letters of credit, advices of credit, promissory notes, drafts, instruments, documents, Equity Interests in any entity, leases of personal property and chattel paper, as well as Debtor's Books relating to any of the foregoing.

*"Obligations"* means and includes any and all present or future indebtedness or obligations of Debtor owing to the Secured Party under the Note and the other Subscription Documents, as defined herein, including, without limitation, (i) all interest and other payments required thereunder that are not paid when due, and (ii) all of the Secured Party Expenses which Debtor is required to pay or reimburse by this Agreement, by law, or otherwise.

*"Permitted Liens"* means (i) statutory liens of landlords and liens of carriers, warehousemen, bailees, mechanics, materialmen and other like liens imposed by law, created in the ordinary course of business and securing amounts not yet due (or which are being contested in good faith, by appropriate proceedings or other appropriate actions which are sufficient to prevent imminent foreclosure of such liens), and with respect to which adequate reserves or other appropriate provisions are being maintained by Debtor in accordance with generally accepted accounting principles (**"GAAP"**) , (ii) deposits made (and the liens thereon) in the ordinary course of business of Debtor (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts, (iii) liens for taxes not yet due and payable or which are being contested in good faith and with respect to which adequate reserves are being maintained by Debtor in accordance with GAAP, (iv) purchase money liens relating to the acquisition of equipment, machinery or other goods of Debtor approved in writing by the Secured Party (which approval shall not be unreasonably withheld, conditioned or delayed) and (v) liens in favor of the Secured Party under the Subscription Documents.

*"Pledged Equity"* means, with respect to Debtor, 100% of the issued and outstanding Equity Interests of any subsidiary that is directly owned by Debtor, whether now owned or hereafter acquired, in each case together with the certificates (or other agreements or instruments), if any, representing such shares, and all options and other rights, contractual or otherwise, with respect thereto, including, but not limited to, the following:

(1) all Equity Interests representing a dividend thereon, or representing a distribution or return of capital upon or in respect thereof, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder thereof, or otherwise in respect thereof; and

2

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

(2) in the event of any consolidation or merger involving the issuer thereof and in which such issuer is not the surviving person, all shares of each class of the Equity Interests of the successor person formed by or resulting from such consolidation or merger, to the extent that such successor person is a direct subsidiary of an Debtor.

The term "Pledged Equity" specifically includes, but is not limited to, all rights of Debtor embodied in or arising out of the Debtor's status as a shareholder or member, consisting of: (a) all economic rights, including without limitation, all rights to share in the profits and losses and all rights to receive distributions of the assets; and (b) all governance rights, including without limitation, all rights to vote, consent to action and otherwise participate in the management.

For avoidance of doubt, nothing in this Security Agreement, or the other Subscription Documents, shall restrict the Debtor from consummating the Merger (as defined in the Note), and any shares transferred by the Debtor pursuant to the Merger, shall be excluded from the term Pledged Equity after such transfer.

*"Secured Party Expenses"* means and includes (i) all costs or expenses required to be paid by Debtor under this Agreement that are instead paid or advanced by the Secured Party, including without limitation, all taxes, insurance, satisfaction of liens, securities interests, encumbrances or other claims at any time levied or placed on the Collateral, (ii) all reasonable costs and expenses incurred to correct any default or enforce any provision of this Agreement, or in gaining possession of, maintaining, disabling, handling, preserving, storing, shipping, selling, preparing for sale or advertising to sell all or any part of the Collateral, irrespective of whether a sale is consummated, and (iii) all reasonable costs and expenses (including reasonable attorney's fees) incurred by the Secured Party in enforcing or defending this Agreement, irrespective of whether suit is brought.

*"Subscription Documents"* means and includes the Note, Securities Purchase Agreement and all related documents executed in connection therewith, including, without limitation, any amendments to any of the foregoing.

2.    **Construction**. Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and vice versa, to the part include the whole, "including" is not limiting, and "or" has the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Section references are to this Agreement, unless otherwise specified.

3.    **Creation of Security Interest**. In order to secure Debtor's timely payment of the Obligations and timely performance of each and all of its covenants and obligations under this Agreement, the Subscription Documents, and any other document, instrument or agreement executed by Debtor or delivered by Debtor to the Secured Party in connection with the Obligations, Debtor hereby unconditionally and irrevocably grants, pledges and hypothecates to the Secured Party a continuing security interest in and to, a lien upon, assignment of, and right of set-off against, all presently existing and hereafter acquired or arising Collateral. Such security interest shall be a first priority security interest. Such security interest shall attach to all Collateral without further act on the part of the Secured Party or Debtor.

3

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

4.    **Filings; Further Assurances**.

(a)    General. The Secured Party is authorized to file a UCC-1 Financing Statement (or its equivalent) with the Secretary of State of the State of Delaware and in any other jurisdictions where the Secured Party chooses to file, with respect to the Debtor. Debtor also authorize the filing by the Secured Party of such other UCC financing statements, continuation financing statements, fixture filings, filing appropriate notices in international or federal registries including the United States Patent and Trademark Office, security agreements, mortgages, deeds of trust, chattel mortgages, assignments, assignments of rents, motor vehicle lien acknowledgments and other documents as the Secured Party may reasonably require in order to perfect, maintain, protect or enforce its security interest in the Collateral or any portion thereof and in order to fully consummate all of the transactions contemplated under this Agreement. Subject to the foregoing, if so requested by the Secured Party at any time hereafter, Debtor shall promptly execute and deliver to the Secured Party such fixture filings, agreements, security agreements, mortgages, deeds of trust, chattel mortgages, assignments, motor vehicle lien acknowledgments and other documents as the Secured Party may reasonably require from such Debtor in order to perfect, maintain, protect or enforce its rights under this Agreement. Debtor shall promptly deliver to the Secured Party any and all certificates and instruments constituting the Pledged Equity in suitable form for transfer by delivery and accompanied by duly executed instruments of transfer or assignment in blank. Debtor hereby irrevocably makes, constitutes and appoints the Secured Party as such Debtor's true and lawful attorney with power, upon Debtor's failure or refusal to promptly comply with its obligations in this Section 4(a), to sign the name of Debtor on any of the above-described documents or on any other similar documents which need to be executed, recorded or filed in order to perfect, maintain, protect or enforce the Secured Party's security interest in the Collateral. Debtor further agrees to enter into such control agreements with the Secured Party and such third parties as may be reasonably necessary to obtain a first priority security interest in the Collateral, including deposit accounts and Pledged Equity, and agrees to use best efforts to obtain the assent of the third parties to said agreements.

(b)    Mortgage. Debtor hereby authorizes Secured Party to obtain a mortgage on any and all of its real property. Debtor covenants and agrees that it will execute any documents, provide any information and take such other action as is reasonably requested by Secured Party to effectuate such mortgage.

(c)    Additional Matters. Without limiting the generality of Section 4(a), Debtor will at the reasonable written request of the Secured Party, appear in and defend any action or proceeding which is reasonably expected to have a material and adverse effect with respect to such Debtor's title to, or the security interest of the Secured Party in, the Collateral.

(d)    Assignment of Receivables and Lockbox Agreement. So long as the Note is outstanding, , the Secured Party may in its sole discretion, require the Debtor to cause is debtors, customers, or any other party that is due to make a payment to the Debtor, regardless of whether such payment is due by contract, or otherwise, and regardless of whether such expected payment has been recorded in the books of the Debtor as a trade receivable, accounts receivable, or otherwise, to make such payment to a bank account governed by a Lock Box Agreement and/or subject to a Control Agreement, in accordance with a form and execution as determined by and satisfactory to, the Secured Party. Additionally, the Secured Party may in its sole discretion require

4

DocuSign Envelope ID. E47650FE-DF4A-4152-8481-FA139276D389

Debtor to make an assignment to the Secured Party of any of the payments, contracts, receivables and/or other agreements, referenced in this Section 4(d).

(e)    Information Rights with Respect to Debtor's Bank Accounts. So long as this Note is outstanding, the Secured Party may in its sole discretion, require Debtor to provide Secured Party with viewer access to any bank account used by the Debtor even if such bank account is not in the name of the Debtor. Secured Party shall have the right to require use of a third party technology platform, to obtain the access required under this Section 4(e).

5.    **Representations, Warranties and Agreements.** Debtor represents, warrants and agrees as follows:

(a)    No Other Encumbrances. Debtor has good and marketable title to its Collateral, free and clear of any liens, claims, encumbrances and rights of any kind, except the Liens scheduled pursuant to the Securities Purchase Agreement or as otherwise approved in writing by the Secured Party, and has the right to pledge, sell, assign or transfer the Collateral.

(b)    Authorization of Pledged Equity. All Pledged Equity is duly authorized and validly issued, is fully paid and, to the extent applicable, nonassessable and is not subject to the preemptive rights of any person.

(c)    Security Interest/Priority. This Agreement creates a valid security interest in favor of the Secured party in the Collateral of Debtor and, when properly perfected by filing shall constitute a valid and perfected first priority security interest in such Collateral (including all uncertificated Pledged Equity consisting of partnership or limited liability company interests that do not constitute securities), to the extent such security interest can be perfected by filing under the UCC, free and clear of all liens except for liens permitted by the Securities Purchase Agreement. The taking possession by the Secured Party of the certificated securities (if any) evidencing the Pledged Equity and all other Instruments constituting Collateral will perfect and establish the first priority of the Secured Party's security interest in all the Pledged Equity evidenced by such certificated securities and such instruments. With respect to any Collateral consisting of a deposit account, investment property, securities entitlement or held in a securities account, upon execution and delivery by the Debtor, the applicable depository bank or securities intermediary and the Secured Party of an agreement granting control to the Secured Party over such Collateral, the Secured Party shall have a valid and perfected first priority security interest in such Collateral. With respect to any security interest granted by the Debtor to a party besides the Secured Party, that would otherwise be senior secured obligation of the Debtor with respect to the Obligations, Debtor agrees to cause the holders of such security interests to execute subordination agreements with respect to the Obligations, and to deliver such subordination agreements to the Secured Party on or prior to the date hereof.

(d)    Consents; Etc. There are no restrictions in any organizational document governing any Pledged Equity or any other document related thereto which would limit or restrict (i) the grant of a security interest pursuant to this Agreement in such Pledged Equity, (ii) the perfection of such security interest or (iii) the exercise of remedies in respect of such perfected security interest in the Pledged Equity as contemplated by this Agreement. Except for (i) the filing

5

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

or recording of UCC financing statements, (ii) the filing of appropriate notices with the United States Patent and Trademark Office, the United States Copyright Office; with other applicable international registries, federal registries; and with local registries regarding assignments of rents and fixture filings, (iii) obtaining control to perfect the security interests created by this Agreement (to the extent required under Section 4 hereof), (iv) such actions as may be required by laws affecting the offering and sale of securities, and (v) consents, authorizations, filings or other actions which have been obtained or made, no consent or authorization of, filing with, or other act by or in respect of, any arbitrator or governmental authority and no consent of any other person (including, without limitation, any stockholder, member or creditor of Debtor), is required for (A) the grant by Debtor of the security interest in the Collateral granted hereby or for the execution, delivery or performance of this Agreement by Debtor, (B) the perfection of such security interest (to the extent such security interest can be perfected by filing under the UCC, the granting of control (to the extent required, or as provided in Section 4(a) hereof) or by filing an appropriate notice with the United States Patent and Trademark Office, the United States Copyright Office or other applicable registry) or (C) the exercise by the Secured party of the rights and remedies provided for in this Agreement.

(e)    Location of Place(s) of Business. All places of business of Debtor, including the identification of the principal place of business of Debtor, and the address(es) at which the Collateral is (are) located, are indicated on Schedule 5(e) hereto. Debtor shall not, without at least thirty (30) days prior written notice to the Secured Party, relocate such principal place of business or the Collateral, with no relocation being permitted outside the United States in any event.

(f)    Right to Inspect the Collateral. The Secured Party shall have the right, during usual business hours of the Debtor and upon reasonable advance notice, to inspect and examine the Collateral. Debtor agrees that any reasonable expenses incurred by the Secured Party in connection with this Section 5(f) during the continuance of an Event of Default shall constitute Secured Party Expenses.

(g)    Negative Covenants. Except for sale of inventory in the ordinary course of business, Debtor shall not (i) sell, lease or otherwise dispose of, relocate or transfer, any of the Collateral, except dispositions of Collateral that is worn out, obsolete or no longer necessary in the business of Debtor, (ii) allow any liens on or grant security interests in the Collateral except the Permitted Liens or (iii) change the Debtor's name or add any new fictitious name without the written consent of the Secured Party.

(h)    Further Information. Debtor shall promptly supply the Secured Party with such information concerning Debtor and Debtor's business as the Secured Party may reasonably request from time-to-time hereafter, and shall within five (5) business days of obtaining knowledge thereof, notify the Secured Party of any event which constitutes an Event of Default.

(i)    Solvency. Debtor is now and shall be at all times hereafter able to pay its debts (including trade debts) as they mature.

(j)    Secured Party Expenses. Debtor shall, within fifteen (15) business days of written demand from the Secured Party accompanied by adequate documentation of such expenses, reimburse the Secured Party for all sums expended by it which constitute Secured Party

6

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

Expenses and, in the event that Debtor does not pay any Secured Party Expenses payable to a third party within fifteen (15) business days after notice thereof, then the Secured Party may immediately and without further notice pay such Secured Party Expenses on Debtor's behalf. All such expenses shall become a part of the Obligations and, at the Secured Party's option, will (i) be payable on demand or (ii) be added to the balance of the Note and be payable proportionately with any installment payments that become due during the remaining term of the Note or, (iii) at Secured Party's option, may be treated as a balloon payment which will be due and payable at the maturity of the Note. This Agreement shall also secure payment of those amounts.

(k)  Commercial Tort Claims. Debtor has no pending commercial tort claim (as a plaintiff) against any individual or entity (a "Commercial Claim"). Debtor shall promptly deliver to the Secured Party notice of any Commercial Claim that a Debtor may bring against any individual or entity, together with such information with respect thereto as the Secured Party may reasonably request. Within ten (10) days after a written request by the Secured Party, Debtor shall grant the Secured Party a security interest in any pending Commercial Claim to the extent such security interest is permitted by applicable law.

(l)  Reliance by the Secured Party; Representations Cumulative. Each representation, warranty and agreement contained in this Agreement shall be conclusively presumed to have been relied on by the Secured Party regardless of any investigation made or information possessed by the Secured Party. The representations, warranties and agreements set forth herein shall be cumulative and in addition to any and all other representations, warranties and agreements set forth in the Subscription Documents or any other documents created after the Closing Date and signed by Debtor.

6.  **Events of Default**. The occurrence of any Event of Default under the Note and the Securities Purchase Agreement, after the expiration of any applicable grace or cure period, shall constitute an "**Event of Default**" by Debtor under this Agreement.

7.  **Rights and Remedies**.

(a)  Rights and Remedies of the Secured Party.

(i)  Upon the occurrence and during the continuance of an Event of Default (and after the expiration of a ten (10) business day cure period), the Secured Party may cause any one or more of the following to occur, all of which are authorized by Debtor:

(A)  The Secured Party may make such payments and do such acts as it reasonably considers necessary to protect its security interest in the Collateral. Debtor agrees to promptly assemble and make available the Collateral if the Secured Party so reasonably requires. Debtor authorizes the Secured Party to enter the premises where any of the Collateral is located, take and maintain possession of the Collateral, or any part thereof, and pay, purchase, contest or compromise any encumbrance, claim, right or lien which, in the reasonable opinion of the Secured Party, appears to be prior or superior to its security interest in violation of this Agreement, and to pay all reasonable expenses incurred in connection therewith.

7

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

(B)     The Secured Party shall be automatically deemed to be granted a license or other appropriate right to use, without charge or representation or warranty, Debtor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, and any other property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any Collateral.

(C)     The Secured Party may ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell (in the manner provided for herein) the Collateral.

(D)     The Secured Party may sell the Collateral at either a public or private sale, or both (which in the case of a private sale of Pledged Equity, shall be to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own accounts, for investment and not with a view to the distribution or resale thereof), by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Debtor's premises) as is commercially reasonable (it not being necessary that the Collateral be present at any such sale). In the case of a sale of Pledged Equity, the Secured Party shall have no obligation to delay sale of any such securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act of 1933. Debtor further acknowledges and agrees that any offer to sell any Pledged Equity which has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation in the financial community of New York, New York (to the extent that such offer may be advertised without prior registration under the Securities Act of 1933), or (ii) made privately in the manner described above shall be deemed to involve a "public sale" under the UCC, notwithstanding that such sale may not constitute a "public offering" under the Securities Act of 1933, and the Secured Party may, in such event, bid for the purchase of such securities.

(E)     The Secured Party shall be entitled to give notice of the disposition of the Collateral as follows: (1) the Secured Party shall give Debtor a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Collateral, the time on or after which the private sale or other disposition is to be made, (2) the notice shall be personally delivered or mailed, postage prepaid, to Debtor at least ten (10) days before the date fixed for the sale, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made, unless the Collateral is perishable or threatens to decline speedily in value, in which case the Secured Party shall use commercially reasonable efforts to provide such notice to Debtor as far in advance of such disposition as is practicable.

(F)     The Secured Party may purchase all or any portion of the Collateral at any public sale by credit bid or other appropriate payment therefor.

(G)     To the extent permitted by applicable law, the Secured Party shall have the following rights and remedies regarding the appointment of a

8

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

receiver: (1) the Secured Party may have a receiver appointed as a matter of right, (2) the receiver may be an employee of the Secured Party and may serve without bond, and (3) all fees of the receiver and his or her attorney shall be Secured Party Expenses and become part of the Obligations and shall be payable on demand, with interest at the Rate specified in the Note from the date of expenditure until repaid.

(H) To the extent permitted by applicable law, the Secured Party, either itself or through a receiver, may collect the payments, rents, income, dividends, distributions and revenues (together, "Revenue") from the Collateral. The Secured Party may at any time, in its reasonable discretion, transfer any Collateral into its own name or that of its nominee(s) and receive the Revenue therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as the Secured Party may determine. Insofar as the Collateral consists of accounts, general intangibles, loans receivable, insurance policies, instruments, chattel paper, choses in action, or similar property, the Secured Party may demand, collect, issue receipts for, settle, compromise, adjust, sue for, foreclose, or otherwise realize on the Collateral as the Secured Party may determine (in its reasonable discretion), whether or not the Obligations are then due. For these purposes, the Secured Party may, on behalf of and in the name of Debtor, (1) receive, open, and dispose of mail addressed to Debtor; (2) change any address to which mail and payments are to be sent; and (3) endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to the payment, shipment, or storage of any Collateral. To facilitate collection, the Secured Party may notify account debtors and Debtor on any Collateral to make payments directly to the Secured Party.

(ii) The Secured Party may deduct from the proceeds of any sale of the Collateral all Secured Party Expenses incurred in connection with the enforcement and exercise of any of the rights and remedies of the Secured Party provided for herein, irrespective of whether suit is commenced. If such deduction does not occur (in the Secured Party's reasonable discretion), upon demand, Debtor shall pay all of such Secured Party Expenses. Any deficiency which exists after disposition of the Collateral as provided herein will be paid immediately by Debtor, and any excess that exists will be returned, without interest and subject to the rights of third parties, to Debtor by the Secured Party; provided, however, that if any excess exists at a time when any of the Obligations remain outstanding, such excess shall instead remain as part of the Collateral and continue to be subject to the security interest in Section 3(a) above until such time as all of the Obligations have been fully satisfied or otherwise terminated.

(iii) Voting and payment Rights in Respect of the Pledged Equity.

(A) So long as no Event of Default shall exist, Debtor may (1) exercise any and all voting and other rights pertaining to the Pledged Equity of such Debtor or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Securities Purchase Agreement and (2) receive and retain any and all dividends (other than stock dividends and other dividends constituting Collateral which are addressed hereinabove), principal or interest paid in respect of the Pledged Equity to the extent they are allowed under the Securities Purchase

9

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

Agreement; and

(B)    During the continuance of an Event of Default, (1) all rights of an Debtor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to clause (A)(1) above shall cease and all such rights shall thereupon become vested in the Secured Party which shall then have the sole right to exercise such voting and other consensual rights, (2) all rights of an Debtor to receive the dividends, principal and interest payments which it would otherwise be authorized to receive and retain pursuant to clause (A)(2) above shall cease and all such rights shall thereupon be vested in the Secured Party which shall then have the sole right to receive and hold as Collateral such dividends, principal and interest payments, and (3) all dividends, principal and interest payments which are received by a Debtor contrary to the provisions of clause (B)(2) above shall be received in trust for the benefit of the Secured Party, shall be segregated from other property or funds of such Debtor, and shall be forthwith paid over to the Secured Party as Collateral in the exact form received, to be held by the Secured Party as Collateral and as further collateral security for the Secured Obligations.

(b)    Rights and Remedies Cumulative. The rights and remedies of the Secured Party under this Agreement and any other agreements and documents delivered or executed in connection with the Obligations shall be cumulative. The Secured Party shall also have all other rights and remedies not inconsistent herewith as are provided under applicable law, or in equity. No exercise by the Secured Party of any one right or remedy shall be deemed an election.

8.    **Additional Waivers**. The Secured Party shall not in any way or manner be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency or other person whomsoever, except to the extent that such loss, damage, liability, cost or expense has resulted from the gross negligence or willful misconduct of the Secured Party or its affiliates. If the Secured Party at any time has possession of any Collateral, whether before or after an Event of Default, the Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if the Secured Party takes such action for that purpose as Debtor shall request or as the Secured Party, in its reasonable discretion, shall deem appropriate under the circumstances, but failure to honor any request by Debtor shall not of itself be deemed to be a failure to exercise reasonable care. The Secured Party shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve, or maintain any security interest given to secure the Obligations.

9.    **Notices**. All notices or demands by any party relating to this Agreement shall be made in writing as provided in the Note, and such notices shall be delivered to the addresses indicated therein. Each party shall provide written notice to the other party of any change in address.

10.    **Choice of Law**. The validity of this Agreement, its construction, interpretation and enforcement, and the rights of the parties hereunder and concerning the Collateral, shall be

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

determined under, governed by, and construed in accordance with the laws of the state of Delaware as applied to contracts made and to be fully performed in such state, without regard to the conflicts of laws provisions thereof, except to the extent that the validity, perfection or enforcement of a security interest hereunder in respect of any Collateral is governed by the laws of the state of Delaware or some other jurisdiction, in which case such laws shall govern.

11.    **Waiver of Jury Trial.** EACH OF SECURED PARTY AND DEBTOR WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

12.    **General Provisions.**

(a)    Effectiveness. This Agreement shall be binding and deemed effective against Debtor when executed by Debtor and the Secured Party.

(b)    Successors and Assigns. This Agreement shall bind and inure to the benefit of the successors and permitted endorsees, transferees and assigns of the Secured Party. Debtor shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Secured party, and any such assignment without prior written consent of the Secured Party, shall be absolutely void.

(c)    Section Headings. Section headings are for convenience only.

(d)    Interpretation. No uncertainty or ambiguity herein shall be construed or resolved against the Secured Party or Debtor, whether under any rule of construction or otherwise. This Agreement shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties.

(e)    Severability of Provisions. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

(f)    Entire Agreement; Amendments. This Agreement and the agreements and documents referenced herein contain the entire understanding of the parties with respect to the subject matter covered herein and supersede all prior agreements, negotiations and understandings, written or oral, with respect to such subject matter. No provision of this Agreement shall be waived or amended other than by an instrument in writing signed by Debtor and the Secured Party.

(g)    Good Faith. The parties intend and agree that their respective rights, duties, powers, liabilities and obligations shall be performed, carried out, discharged and exercised reasonably and in good faith.

(h)    Waiver and Consent. No delay or omission on the part of a party in exercising any right shall operate as a waiver of such right or any other right. A waiver by the Secured Party of a provision of this Agreement or any other agreement between or among the parties shall not prejudice or constitute a waiver of the Secured Party's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by the Secured Party, nor any course of dealing between the Secured Party and Debtor, shall constitute

11

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

a waiver of any of the Secured Party's rights or of any of Debtor's obligations as to any future transactions. Whenever the consent of the Secured Party is required under this Agreement, the granting of such consent by the Secured Party in any instance shall not constitute continuing consent to subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the reasonable discretion of the Secured Party.

(i)    Counterparts. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.

(j)    Termination. Upon full satisfaction or other termination of the Obligations (i) the Secured Party shall release and return to Debtor all of the Collateral and any and all certificates and other documentation representing or relating to the Collateral and (ii) the security interests provided for under this Agreement shall be terminated and of no further force and effect. At Debtor's expense, the Secured Party shall take all actions reasonably requested by Debtor in connection with the foregoing.

(k)    Consent of Debtor as Issuers of Pledged Equity. Debtor/issuer of Pledged Equity party to this Agreement hereby acknowledges, consents and agrees to the grant of the security interests in such Pledged Equity pursuant to this Agreement, together with all rights accompanying such security interest as provided by this Agreement and applicable law, notwithstanding any anti-assignment provisions in any operating agreement, limited partnership agreement or similar organizational or governance documents of such issuer.

*[remainder of page intentionally left blank]*

12

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized persons on the date first written above.

**The Debtor:**

**HSW Holdings Corporation**

By: _____
Name: Duane Moore
Title: President

**Hawaiian Springs LLC**
**By its Manager, HSW Holdings Corporation**

By: _____
Name: Duane Moore
Title: President

**The Secured Party:**

**LEONITE FUND I, LP**
**By its Manager, Leonite Advisors LLC**

By: _____
Name: Avi Geller
Title: Manager

*[signature page to Security Agreement]*

13

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

Schedule 5(e)

Addresses of Debtor/Principal Place of Business of Debtor

16-305 Old Volcano Road
Kea'au, HI 96749

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

## EXHIBIT A

## COLLATERAL

**Applicable Definitions:**

In addition to the definitions of Article 9 of the Uniform Commercial Code of the State of Delaware, the following defined terms are used herein:

*"Debtor's Books"* means and includes all of Debtor's books and records in any medium or form, including, but not limited to, all records, ledgers and computer programs, disk or tape files, thumb drives, material stored in the "cloud," printouts and other information indicating, summarizing or evidencing the Collateral.

"*Equity Interests*" means, with respect to any person, all of the shares of capital stock of (or other ownership or profit interests in) such person, all of the warrants, options or other rights for the purchase or acquisition from such person of shares of capital stock of (or other ownership or profit interests in) such person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such person or warrants, rights or options for the purchase or acquisition from such person of such shares (or such other interests), and all of the other ownership or profit interests in such person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

*"Negotiable Collateral"* means and includes all of Debtor's presently existing and hereafter acquired or arising letters of credit, advices of credit, promissory notes, drafts, instruments, documents, Equity Interests in any entity, leases of personal property and chattel paper, as well as Debtor's Books relating to any of the foregoing.

"*Pledged Equity*" means, with respect to Debtor, 100% of the issued and outstanding Equity Interests of any subsidiary that is directly owned by Debtor, whether now owned or hereafter acquired, in each case together with the certificates (or other agreements or instruments), if any, representing such shares, and all options and other rights, contractual or otherwise, with respect thereto, including, but not limited to, the following:

(1) all Equity Interests representing a dividend thereon, or representing a distribution or return of capital upon or in respect thereof, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder thereof, or otherwise in respect thereof; and

(2) in the event of any consolidation or merger involving the issuer thereof and in which such issuer is not the surviving person, all shares of each class of the Equity Interests of the successor person formed by or resulting from such consolidation or merger, to the extent that such successor person is a direct subsidiary of an Debtor.

The term "Pledged Equity" specifically includes, but is not limited to, all rights of Debtor embodied in or arising out of the Debtor's status as a shareholder or member, consisting of: (a) all economic rights, including without limitation, all rights to share in the profits and losses and all rights to receive distributions of the assets; and (b) all governance rights, including without limitation, all rights to vote, consent to action and otherwise participate in the management.

DocuSign Envelope ID: E47650FE-DF4A-4152-8481-FA139276D389

**Identification of Collateral:**

All of the right, title and interest of Debtor in and to the following property, wherever located and whether now owned by Debtor or hereafter acquired by Debtor:

1.      All accounts, chattel paper, contracts, contract rights, accounts receivable, tax refunds, tax credits, Notes receivable, Pledged Equity, documents, choses in action and general intangibles, including, but not limited to, proceeds of inventory and returned goods and proceeds from the sale of goods and services, and all rights, liens, securities, guaranties, remedies and privileges related thereto, including the right of stoppage in transit and rights and property of any kind forming the subject matter of any of the foregoing;

2.      All certificates of deposit and all time, savings, demand, or other deposit accounts in the name of Debtor or in which Debtor has any right, title or interest, including but not limited to all sums now or at any time hereafter on deposit, and any renewals, extensions or replacements of and all other property which may from time to time be acquired directly or indirectly using the proceeds of any of the foregoing;

3.      All inventory and equipment of every type or description wherever located, including, but not limited to all raw materials, parts, containers, work in process, finished goods, goods in transit to Debtor's distribution facilities, wares, merchandise, furniture, fixtures, hardware, machinery, tools, parts, supplies, automobiles, trucks, other intangible property of whatever kind and wherever located associated with the Debtor's business, tools and goods returned for credit, repossessed, reclaimed or otherwise reacquired by Debtor (all goods in transit to customers shall be expressly excluded from the definition of Collateral);

4.      All documents of title and other property from time to time received, receivable or otherwise distributed in respect of, exchange or substitution for or addition to any of the foregoing including, but not limited to, any documents of title;

5.      All know-how, information, labels, permits, patents, copyrights, goodwill, trademarks, trade names, licenses and approvals held by Debtor, including all other intangible property of Debtor;

6.      All assets of any type or description that may at any time be assigned or delivered to or come into possession of Debtor for any purpose for the account of Debtor or as to which Debtor may have any right, title, interest or power, and property in the possession or custody of or in transit to anyone for the account of Debtor, as well as all proceeds and products thereof and accessions and annexations thereto;

7.      Debtor's tangible and intangible personal property assets, including, but not limited to, all of the following: (i) all accounts, health-care-insurance receivables, cash and currency, chattel paper, deposit accounts, documents, equipment, fixtures, general intangibles, instruments, intellectual property, inventory, investment property, Negotiable Collateral, loans receivable, motor vehicles, Pledged Equity, goods, supporting obligations, Debtor's Books, and such other assets of Debtor as may hereafter arise or Debtor may hereafter acquire or in which the Secured Party may from time-to-time obtain a security interest, and (ii) the proceeds of any of the foregoing, including, but not limited to, proceeds of insurance covering the foregoing or any portion thereof; provided, however, that notwithstanding anything to the contrary contained in this Agreement, the Collateral does not include any "hazardous waste" as that term is defined under 42 U.S.C. section 6903(5), as such section may be from time to time amended, or under any regulations thereunder; and

8.      All proceeds (including but not limited to insurance proceeds), products of, and accessions and annexations of any of the foregoing.

**EXHIBIT C**

Docusign Envelope ID: ─────────────────────────────

## UNANIMOUS WRITTEN CONSENT
## OF THE MEMBERS AND SOLE MANAGER
## OF
## HAWAIIAN SPRINGS LLC

### A Delaware limited liability company

### December 26, 2023

The undersigned, being all of the members ("Members") and the sole manager ("Manager") of Hawaiian Springs LLC, a Delaware limited liability company (the "Company"), in lieu of a meeting of the Members, and pursuant to the authority of Section 18-404(d) of the Delaware Limited Liability Company Act, as amended, hereby irrevocably consent to, authorize and adopt the following resolutions with the same force and effect as if the undersigned were personally present at a meeting of the Members and had voted for the same:

**WHEREAS,** the undersigned constitute all of the Members of the Company and 100% of the voting equity of the Company; and

**WHEREAS,** the undersigned include the sole Manager of the Company; and

**WHEREAS,** due to a series of financial issues and crises facing the Company, and resulting in its near insolvency, the undersigned unanimously consent to the irrevocable appointment of a receiver under applicable law to be ratified by an appropriate court of competent jurisdiction as soon as humanly possible, for the purposes of stabilizing the Company; and

**WHEREAS,** the undersigned consent to the immediate appointment of Robert L. Stevens as Receiver or Custodian, as "board-appointed Receiver" to be ratified by an appropriate court.

**NOW, THEREFORE,** the undersigned Members and Manager unanimously and irrevocably confirm and approve the following acts and resolutions:

**BE IT RESOLVED,** that Robert Stevens is appointed as Receiver or Custodian to be ratified by an appropriate court of competent jurisdiction as soon as humanly possible, for the purposes of reorganization or liquidation of the Company; and

**BE IT FURTHER RESOLVED,** that the jurisdiction of the courts located in the venue designated by Mr. Stevens to hear the Company's petition for the appointment of a Receiver and the entry of an injunction is hereby consented to; and

**BE IT FURTHER RESOLVED,** that the authorized officers of the Company are hereby severally authorized and directed to take, or cause to be taken, all actions in the name and on behalf of the Company, that such officers determine are necessary or advisable to consummate the transactions contemplated by, or otherwise to effect the purposes of, the foregoing resolutions, including, but

not limited to, signing, certifying to, verifying, acknowledging, delivering, accepting, filing and recording all agreements, instruments and documents related to any of the resolutions; and

**BE IT FURTHER RESOLVED**, that all acts of the officers of the Company taken before the date hereof in connection with matters referred to in these resolutions are hereby ratified, approved and adopted as acts of the Company.

**IN WITNESS WHEREOF**, the undersigned have signed this Written Consent to become effective as of the 26th day of December, 2023.

## MEMBERS:

**Lewis Cohen**

**HSW Holdings Corporation**

By: _____

Name: _____
Duane Moore

Title: _____
President

**Leonite Fund I, LP**

By : _____

Name: _____
Avrohom Geller

Title: _____
CIO

## SOLE MANAGER:

**HSW Holdings Corporation**

By : _____

Name: _____
Duane Moore

Title: _____
President

DocuSign Envelope ID: 0040406D-0208-4000-0401-0D00700D0100

## UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS
## OF HSW HOLDINGS CORPORATION

### A Nevada corporation

### December 26, 2023

The undersigned, being all of the directors (the "Board of Directors" or "Board") of HSW Holdings Corporation, a Nevada corporation (the "Company"), do hereby consent and agree to the waiver of all notices required for a meeting of the Board of Directors, and, pursuant to the provisions of NRS 78.315, to take the following actions and to irrevocably adopt the following resolutions, effective as of the date first written above, in lieu of a meeting of the Board of Directors:

**WHEREAS**, the undersigned constitute all of the Members of the Board; and

**WHEREAS**, due to a series of financial issues and crises facing the Company, and resulting in its near insolvency, the undersigned unanimously consent to the appointment of a receiver under applicable law for the purposes of reorganization in an orderly fashion; and

**WHEREAS**, the undersigned consent to the immediate appointment of Robert L. Stevens as Receiver or Custodian, as "board-appointed Receiver" to be ratified by an appropriate court.

**NOW, THEREFORE**, the undersigned unanimously confirm and irrevocably approve the following acts and resolutions:

> **BE IT RESOLVED,** that Robert Stevens is irrevocably appointed as Receiver or Custodian to be ratified by an appropriate court of competent jurisdiction as soon as humanly possible, for the purposes of stabilizing the Company; and

> **BE IT FURTHER RESOLVED,** that the jurisdiction of the court(s) designated by Mr. Stevens to hear the Company's petition for the appointment of a Receiver and the entry of an injunction is hereby consented to; and

> **BE IT FURTHER RESOLVED,** that the authorized officers of the Company are hereby severally authorized and directed to take, or cause to be taken, all actions in the name and on behalf of the Company, that such officers determine are necessary or advisable to consummate the transactions contemplated by, or otherwise to effect the purposes of, the foregoing resolutions, including, but not limited to, signing, certifying to, verifying, acknowledging, delivering, accepting, filing and recording all agreements, instruments and documents related to any of the resolutions; and

> **BE IT FURTHER RESOLVED** that all acts of the officers of the Company taken before the date hereof in connection with matters referred to in these resolutions are hereby ratified, approved and adopted as acts of the Company.

**IN WITNESS WHEREOF**, the undersigned Directors have signed this Written Consent to become effective as of the 26th day of December, 2023.

**DIRECTORS:**

Lewis Cohen

Duane Moore

Eric Austin

Bill Caragol

Doug Benoit

Baird Fogel

**EXHIBIT D**

DocuSign Envelope ID: 58106061-C22C-4661-B45D-27DA06060061

## STANDSTILL AGREEMENT

THIS **STANDSTILL AGREEMENT** (the "**Standstill**") is entered into as of December 26, 2023 (the "**Effective Date**"), by and between **Leonite Fund I, LP**, a Delaware Limited Partnership (the "**Investor**"), **HSW HOLDINGS CORPORATION**, a corporation organized and existing under the laws of the state of Nevada ("**HSW**"), and **HAWAIIAN SPRINGS LLC**, a limited liability company organized and existing under the laws of the state of Delaware ("**HSLLC**") (HSW and HSLLC are collectively referred to herein as the "**Company**") (Investor and Company may collectively be referred to as the "**Parties**" and individually as a "**Party**").

**WHEREAS**, the Company issued a senior secured promissory note to Leonite dated September 28, 2022, in the original principal amount of $1,578,947.37 (the "**Note**"), pursuant to that certain securities purchase agreement of even date therewith (the "**Agreement**");

**WHEREAS**, the obligations of the Company under the Note are secured pursuant to the terms of the pledge and security agreement, dated September 28, 2022 (the "**Pledge and Security Agreement**" and collectively with the Note, the Agreement, and the other documents executed in connection therewith, the "**Transaction Documents**");

**WHEREAS**, The Company has failed to make certain payments as required under the Transaction Documents (the "**Non-Payment Default**");

**WHEREAS**, certain events of default have occurred and are continuing under the Transaction Documents, including, without limitation: (i) failure to make certain payments as required under the Transaction Documents, (ii) cross default, (iii) the partial cessation of operations, (iv) failure to maintain assets, and (v) material adverse event (the foregoing events of default, collectively referred to hereinafter as the "**Specified Defaults**").

**WHEREAS**, the Borrower seeks to induce the Investor to forbear on exercising certain rights available to the Investor under the Note related to the default of the Note;

**WHEREAS**, the Borrower and the Investor desire to provide for such forbearance;

**NOW THEREFORE**, in consideration of the foregoing, and the following covenants and agreements, or other valuable consideration, the receipt and sufficiency of which are hereby acknowledged and conclusively established, the Parties covenant and agree as follows:

1. The representations, covenants, and recitations set forth in the foregoing recitals are hereby incorporated into and made a part of this Standstill, including all defined terms referenced therein.

2. Except as specifically modified by this Standstill, the terms and conditions of the Transaction Documents shall remain in full force and effect. In the event of any inconsistency between the terms of this Standstill and the terms of the Transaction Documents, the terms of this Standstill shall control. All capitalized terms used herein shall have the meaning ascribed to them in the Transaction Documents, unless defined otherwise herein.

3. For a period beginning on the Effective Date and ending ninety (90) days

thereafter (the "**Forbearance Period**"), provided that, during such Forbearance Period: no other Events of Default besides the Specified Defaults occur under the Transaction Documents; the Company (including its directors, officers, employees and shareholders) reasonably cooperates with the Investor in appointing a receiver and once appointed, in assisting the receiver in performing his duties; this Agreement has been executed by each of the parties hereto; and Leonite has received copies of the fully-executed Resolutions of HSW and HSLLC authorizing the appointment of a Receiver, substantially in the form annexed hereto as Addendum A, then Investor will not continue any litigation, initiate any new collection actions against the collateral in which the Investor was granted a security interest pursuant to the terms of the Pledge and Security Agreement or conduct any sale under Article 9 of the Uniform Commercial Code, provided however, that Investor expressly reserves all other rights and remedies granted to it under the Transaction Documents, including but not limited to, assessing penalties, default interest, and fees on the balance due thereunder.

4.      Termination: This Agreement will automatically terminate on the earliest date (the "Termination Date") of the occurrence of any of the following events (each a "Termination Event"), unless Investor agrees to waive such Termination Event in writing:

(a)     a breach (or a potential breach, anticipatory repudiation, cancelation or revocation) by the Company of any representation, warranty, covenant or other agreement contained in this Agreement (in whole or in part);

(b)     any Potential Event of Default or Event of Default, (other than the Current Events of Default) occurs;

(c)     Company files suit against any of the Investor or its officers, directors or employees, or threatens to do so;

(d)     Receiver is not approved within 30 days, or is rejected, by the court;

(e)     Company fails to reasonably cooperates with the Investor in appointing a Receiver and/or once the Receiver is appointed, fails to reasonably cooperate with and assist the Receiver in performing his duties;

(f)     on the last day of the Forbearance Period.

The Company agrees that it will promptly provide notice to Investor on the occurrence of any Termination Event of which they have knowledge or reasonably expected to have knowledge.

The Forbearance will terminate on the Termination Date, without any further action, demand, presentment, protest or notice on the part of the Investor.

5.      Borrower, on behalf of themselves and their heirs, executors, administrators, agents, members, managers, directors, shareholders, officers, successors and assigns (all of the foregoing, collectively, the "Borrower Releasors"), hereby release and forever discharge the Investor (individually and together), its agents, attorneys, successors and assigns (all of the foregoing, collectively, the "Investor Releasees") from all liabilities, charges, claims, Agreements, causes of action, or suits, of whatever kind or nature, whether accrued, absolute, contingent, liquidated or unliquidated, known or unknown, which the Borrower Releasors ever had or now have against the Investor Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date of this Standstill arising from, or relating to, the Note or the other Transaction Documents.

6.    Company's Representations and Warranties:

The Company each hereby represents and warrants to Investor that each of the following statements is true, accurate and complete as of the date hereof and as of the Effective Date:

(a)    it has carefully read and fully understands all of the terms and conditions of this Agreement;

(b)    it has consulted with, or has had a full and fair opportunity to consult with, an attorney of its choosing regarding the terms and conditions of this Agreement;

(c)    it had a full and fair opportunity to participate in the drafting of this Agreement;

(d)    it is freely, voluntarily and knowingly entering into this Agreement;

(e)    in entering into this Agreement, it has not relied upon (ij any representation or warranty of Investor; or (ii) any covenant of Investor that is not set forth in this Agreement;

(f)    the execution and delivery of this Agreement and the performance by it of its obligations under this Agreement (i) are within such its powers; (ii) have been duly authorized by all necessary action; (iii) do not and will not contravene or conflict with any provision of law or its charter and other constitutional documents; (iv) does not require any consent or approval of, notice to, or any other action by or before, any Authority, except such as have been obtained or made and are in full force and effect; (v) will not violate or result in a default or event of default under any material indenture, agreement or other instrument binding upon it or its assets; and (vi) will not result in the creation or imposition of any Lien on any of its asset, except Liens created under the Transaction Documents;

(g)    this Agreement constitutes its legal, valid and binding obligation and is enforceable in accordance with its terms except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or as such enforcement may be limited by equitable principles generally;

(h)    it understands the temporary nature of the Forbearance and of the other provisions of this Agreement and recognizes that Investor has no obligation to expand or extend the Forbearance or any such other provision (if any);

(i)    no Event of Default (other than the Current Events of Default) exists;

(j)    no Termination Event has occurred and is continuing; and

(k)    there is no currently proceeding or pending proposals to dissolve or liquidate the Company.

7.    The Company represents and acknowledges that it has been provided with a reasonable period of time within which to discuss and review the terms of this Standstill with its counsel before signing it and that it is freely and voluntarily signing this Standstill in exchange for the benefits provided herein. Having acknowledged the foregoing, the Parties agree (i) that they will not contest the validity of this Standstill and the transactions contemplated therein, and (ii) that this Standstill shall be construed without regard to any presumption or other rule requiring construction against the Party causing the drafting thereof.

8.    This Standstill may be executed in any number of counterparts and each of such

counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

9.    This Standstill shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Standstill shall be brought only in the state and/or federal courts located in Delaware. The parties to this Standstill hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Standstill or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Standstill or any other related documents by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Standstill and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

*[signature page to follow]*

IN WITNESS WHEREOF the parties have signed this Standstill in one or more counterparts as of the date first hereinabove set forth.

**LEONITE FUND I, LP**

By: _____

Name: Avi Geller

Its: Manager


**HAWAIIAN SPRINGS LLC**

By: _____
    Duane Moore
Name: _____

Its: _____
        President

By: _____
    Lew Cohen
Name: _____

Its: _____
        evp


**HSW HOLDINGS CORPORATION**

By: _____
    Duane Moore
Name: _____

Its: _____
        President

By: _____
    Lew Cohen
Name: _____

Its: _____
        evp

ADDENDUM "A"

## UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS
## OF HSW HOLDINGS CORPORATION

### A Nevada corporation

### December ___, 2023

The undersigned, being all of the directors (the "Board of Directors" or "Board") of HSW Holdings Corporation, a Nevada corporation (the "Company"), do hereby consent and agree to the waiver of all notices required for a meeting of the Board of Directors, and, pursuant to the provisions of NRS 78.315, to take the following actions and to irrevocably adopt the following resolutions, effective as of the date first written above, in lieu of a meeting of the Board of Directors:

**WHEREAS**, the undersigned constitute all of the Members of the Board; and

**WHEREAS**, due to a series of financial issues and crises facing the Company, and resulting in its near insolvency, the undersigned unanimously consent to the appointment of a receiver under applicable law for the purposes of reorganization in an orderly fashion; and

**WHEREAS**, the undersigned consent to the immediate appointment of Robert L. Stevens as Receiver or Custodian, as "board-appointed Receiver" to be ratified by an appropriate court.

**NOW, THEREFORE**, the undersigned unanimously confirm and irrevocably approve the following acts and resolutions:

> **BE IT RESOLVED,** that Robert Stevens is irrevocably appointed as Receiver or Custodian to be ratified by an appropriate court of competent jurisdiction as soon as humanly possible, for the purposes of stabilizing the Company; and

> **BE IT FURTHER RESOLVED,** that the jurisdiction of the courts located in _____ to hear the Company's petition for the appointment of a Receiver and the entry of an injunction is hereby consented to; and

> **BE IT FURTHER RESOLVED,** that the authorized officers of the Company are hereby severally authorized and directed to take, or cause to be taken, all actions in the name and on behalf of the Company, that such officers determine are necessary or advisable to consummate the transactions contemplated by, or otherwise to effect the purposes of, the foregoing resolutions, including, but not limited to, signing, certifying to, verifying, acknowledging, delivering, accepting, filing and recording all agreements, instruments and documents related to any of the resolutions; and

> **BE IT FURTHER RESOLVED** that all acts of the officers of the Company taken before the date hereof in connection with matters referred to in these resolutions are hereby ratified, approved and adopted as acts of the Company.

**IN WITNESS WHEREOF**, the undersigned Directors have signed this Written Consent to become effective as of the _____ day of December, 2023.

**DIRECTORS:**

| | |
|---|---|
| Lewis Cohen | Duane Moore |
| Eric Austin | Bill Caragol |
| Doug Benoit | Baird Fogel |

DocuSign Envelope ID: 5G1G6081-G22E-456F-B45D-27GA6G66666

**UNANIMOUS WRITTEN CONSENT
OF THE MEMBERS AND SOLE MANAGER
OF
HAWAIIAN SPRINGS LLC**

**A Delaware limited liability company**

**December ___, 2023**

The undersigned, being all of the members ("Members") and the sole manager ("Manager") of Hawaiian Springs LLC, a Delaware limited liability company (the "Company"), in lieu of a meeting of the Members, and pursuant to the authority of Section 18-404(d) of the Delaware Limited Liability Company Act, as amended, hereby irrevocably consent to, authorize and adopt the following resolutions with the same force and effect as if the undersigned were personally present at a meeting of the Members and had voted for the same:

**WHEREAS,** the undersigned constitute all of the Members of the Company and 100% of the voting equity of the Company; and

**WHEREAS,** the undersigned include the sole Manager of the Company; and

**WHEREAS,** due to a series of financial issues and crises facing the Company, and resulting in its near insolvency, the undersigned unanimously consent to the irrevocable appointment of a receiver under applicable law to be ratified by an appropriate court of competent jurisdiction as soon as humanly possible, for the purposes of stabilizing the Company; and

**WHEREAS,** the undersigned consent to the immediate appointment of Robert L. Stevens as Receiver or Custodian, as "board-appointed Receiver" to be ratified by an appropriate court.

**NOW, THEREFORE,** the undersigned Members and Manager unanimously and irrevocably confirm and approve the following acts and resolutions:

**BE IT RESOLVED,** that Robert Stevens is appointed as Receiver or Custodian to be ratified by an appropriate court of competent jurisdiction as soon as humanly possible, for the purposes of reorganization or liquidation of the Company; and

**BE IT FURTHER RESOLVED,** that the jurisdiction of the courts located in _____ to hear the Company's petition for the appointment of a Receiver and the entry of an injunction is hereby consented to; and

**BE IT FURTHER RESOLVED,** that the authorized officers of the Company are hereby severally authorized and directed to take, or cause to be taken, all actions in the name and on behalf of the Company, that such officers determine are necessary or advisable to consummate the transactions contemplated by, or otherwise to effect the purposes of, the foregoing resolutions, including, but

not limited to, signing, certifying to, verifying, acknowledging, delivering, accepting, filing and recording all agreements, instruments and documents related to any of the resolutions; and

**BE IT FURTHER RESOLVED**, that all acts of the officers of the Company taken before the date hereof in connection with matters referred to in these resolutions are hereby ratified, approved and adopted as acts of the Company.

**IN WITNESS WHEREOF**, the undersigned have signed this Written Consent to become effective as of the _____ day of December, 2023.

**MEMBERS:**

| | |
|---|---|
| _____ | _____ |
| Lewis Cohen | HSW Holdings Corporation |

_____
Leonite Fund I, LP

**SOLE MANAGER:**

_____
HSW Holdings Corporation

**EXHIBIT E**

DocuSign Envelope ID: C6A0B493-5DDB-4D4D-BFFD-94B7534786F6

## AGREEMENT

This agreement is entered into by and between LEONITE FUND I, LP, HAWAIIAN SPRINGS LLC ("Hawaiian Springs") and HSW HOLDINGS CORPORATION ("HSW") (collectively, the "Parties" and each a "Party"), effective as of January 1, 2024.

The Parties hereby agree to the following notwithstanding any contrary terms contained in any other document or in any other agreement between the Parties:

1.  Any legal proceedings involving the appointment of a receiver for Hawaiian Springs and/or HSW, and any related matters, shall be governed by and construed in accordance with the laws of the State of Colorado without regard to principles of conflicts of laws.

2.  Furthermore, any action brought by any Party against any other Party concerning the appointment of a receiver for Hawaiian Springs and/or HSW, and any related matters, shall be brought only in the state and/or federal courts located in Colorado.

3.  The Parties hereby irrevocably waive any objection to jurisdiction and venue of any such action and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.

LEONITE FUND I, LP

By: _____

Name: __Avi Geller_____

Title: __Manager_____

HAWAIIAN SPRINGS LLC

By: _____

Name: Duane Moore_____

Title: President_____

HSW HOLDINGS CORPORATION

By: _____

Name: Duane Moore_____

Title: President_____

EXHIBIT F

Case No. 1:24-cv-00149-NYW-STV    Document 3-1    filed 01/18/24    USDC Colorado
pg 60 of 61

EXHIBIT F



**Curriculum Vitae**
**Robert L. Stevens**
**November 2023**

## Somerset Capital

387 Corona St.
Suite 555
Denver. CO 80218

### Snapshot

Thirty-six years of experience in securities with expertise in capital formation, M&A, restructuring, compliance, securities registration, transfer agent issues, settlement and clearing, public company registration and filing, and court-ordered Receivership actions. I have founded and operated broker-dealers, registered investment advisory firms, and SEC-registered professional transfer agents. I have served as an expert witness for the United States Securities and Exchange Commission in an enforcement proceeding under transfer agent procedures and securities settlement.

### Licenses, Memberships, and Certifications (Past and Present)

- Court Appointee designation as Receiver, Colorado Marijuana Enforcement Division.
- Member, National Association of Federal Equity Receivers (NAFER).
- Member, Stock Transfer Association.
- FINRA: Series 7, 63, 65, 24, and 4.
- SEC: Federally Cleared Advisor-RIA ("FCA") and Registered Professional Transfer Agent.
- STANDARD AND POORS: Control Person, FINS ("Financial Institution Numbering System").
- DTC: Registered Transfer Agent, Stock and Bond Dividend Paying Agent.

### Professional Highlights

- Appointed Colorado Receiver over a cannabis grow operation and oversaw compliant wind-down of operations and recovery of assets.
- Court-appointed receiver/Custodian 23 times for troubled and turnaround situations.
- Admitted as an expert witness for the United States Securities and Exchange Commission in front of an Administrative Law Judge (ALJ) enforcement proceeding, in February 2009.
- Founder of two SEC Registered Transfer Agents, servicing NASDAQ, OTCBB/QB, Pink Sheet, and private companies.
- Operator and branch principal for a Broker-Dealer / Underwriter.
- Independent director and chair of the Audit Committee, Grom Social Enterprises (NASDAQ: GROM).

### Personal and Community Involvement

- Member, The Society of the Cincinnati.
- Member, Sons of the American Revolution, National Trustee.
- Member, Roger Williams Family Association, General Society of Mayflower Descendants, and numerous other charitable, historical, and hereditary societies.
- 9th Dan Black Belt, Kukkiwon, Seoul, Korea.
- Business Development Board, Lupus Foundation of Colorado.
- Married for 25 years, two daughters.

**Robert L. Stevens**
President

720.442.7000 x303
robert@somerset.vc
www.somerset.vc
www.somerset.capital
www.somerset.fund