**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-00149

**LEONITE FUND I, LP**,

Plaintiff,

v.

**HAWAIIAN SPRINGS, LLC** and **HSW HOLDINGS CORPORATION,**

Defendants.

And

**HAWAII BREWERY DEVELOPMENT CO., INC.**

Intervener Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT HAWAII BREWERY DEVELOPMENT CO.'S MOTION TO DISMISS COMPLAINT**

---

Plaintiff Leonite Fund I, LP ("Leonite"), by and through its undersigned counsel, submits this Response to Motion to Dismiss Complaint by Defendant Hawaii Brewery Development Co., Inc., and in support thereof states as follows:

## BACKGROUND

### *The Parties*

1. Defendant Hawaiian Springs, LLC ("HSLLC") is a producer of premier bottled water products.

2. HSW Holdings Corporation ("HSW") is a holding company that owns a percentage of the issued and outstanding shares of HSLLC and is the Manager of HSLLC.

3. HSLLC's business operations are located on a parcel of land in Kea'au, Hawaii.

4. HSLLC leases the land (the "Leased Premises") pursuant to a lease agreement (the "Lease") between HSLLC and Hawaii Brewery Development Co., Inc. ("HBDC").

***The Loan and Security Agreement***

5. Leonite loaned money to HSLLC and HSW (collectively, the "Borrowers"), as evidenced by a Senior Secured Promissory Note dated September 28, 2022 (the "Note"), and as amended by a First Amendment to Senior Secured Convertible Promissory Note, dated March 20, 2023. *See* Exhibit A to the Complaint at Docket No. 1

6. The Borrowers' obligations under the Note are secured by a Pledge and Security Agreement dated September 28, 2022 (the "Security Agreement"), made by Borrowers for the benefit of Leonite, as Lender. *See* Exhibits A and B to the Complaint.

7. In order to secure the Borrowers' obligations to Leonite under the Note, the Security Agreement granted Leonite a security interest in certain collateral, including the Lease and other contracts. *See* Exhibit B to the Complaint.

***The Default***

8. Events of Default as defined in the Note and Security Agreement have occurred and are continuing, including HSLLC's failure to pay the outstanding balance of the Loan.

9. Upon information and belief, HSLLC does not dispute the aforementioned default. In fact, HSLLC consented to the appointment of the receiver in this case based upon defaults under the Note and Security Agreement.

10. HSLLC has failed to cure the Events of Default existing under the Note and Security Agreement.

11. Following the Events of Default, Leonite loaned additional funds to HSLLC to bring HSLLC current on its rent and other obligations to HBDC.

12. Leonite is concerned that HSLLC will continue to default on its lease obligations to the detriment of Leonite and its collateral.

13. If HSLLC were to be evicted from the Leased Premises, HSLLC would lose its sole source of premier water and would not be able to remain in business, causing substantial damage to the creditors, investors, and employees of HSLLC and HSW, including Leonite.

14. On or about December 13, 2023, Leonite sent a notice of default to HSW and HSLLC asserting that they were in default of their payment obligations under the Note and that, as of that date, the sum of $2,254,323.58 was due and owing by Borrowers to Leonite.

15. HSW and HSLLC do not have sufficient assets to pay the substantial sum owed to Leonite.

***Contractual Grounds for Appointment of Receiver***

16. The Security Agreement entitles Leonite to the appointment of a receiver "as a matter of right" upon an Event of Default. *See* Exhibit B to the Complaint at Section 7(a)(i)(G); *see also* Exhibit A to the Complaint at ¶ 4.1.5.

17. Absent appointment of a receiver pursuant to the express terms of the Security Agreement and Note, Fed. R. Civ. P. 66, and C.R.S. 38-38-602(3), the interests of Leonite and other creditors are in dire jeopardy.

18. In accordance with the terms of the Note and Security Agreement, and due to the financial issues and crises they are facing, on December 26, 2023, HSLLC and HSW agreed to the appointment of Robert L. Stevens as receiver (the "Receiver"), with each entity executing a unanimous written consent of their respective members and managers (the "Unanimous Written Consents"). *See* Exhibits C and D to the Complaint.

19. Leonite, HSW, and HSLLC selected Mr. Stevens as receiver for the reasons discussed in detail in Leonite's Motion to Appoint Receiver, including that he is a qualified receiver who resides in Colorado, where HSLLC and HSW sell products and where Leonite, HSW, and HSLLC have agreed to venue and governing law. *See Motion to Appoint Receiver* at Docket No. 3; Exhibits C, D, and E to the Complaint.

20. On January 1, 2024, Leonite, HSLLC, and HSW executed an agreement pursuant to which each entity agreed to be governed by the laws of the State of Colorado and to venue in state and federal courts located in Colorado. *See* Exhibit E to the Complaint.

21. Given that HSLLC does not dispute that it is in default on the loan, Leonite has not to date pursued a breach of contract claim against HSLLC and HWS.[1] Instead, Leonite has focused on protecting its collateral, including through seeking the appointment of a receiver in accordance with the express terms of the Security Agreement and Note. In fact, to bring such a claim would not add anything to this action. All that would occur would be that Leonite would bring the breach

[1] Leonite reserves the right to pursue a breach of contract claim against HSLLC and HSW for breach of the Note and Security Agreement.

of contract claim (among possibly others), HSLLC and HWS would likely not answer or confess judgment (as they have already acknowledged the default) and then the Receiver would remain in place. There is no benefit to expending time and resources on this exercise, as it would be nothing for than form over substance.

22. Accordingly, on January 8, 2024, Leonite filed its Complaint for Appointment of a Receiver (the "Complaint"), commencing the above-captioned lawsuit against HSLLC and HSW as defendants and seeking, consistent with the Unanimous Written Consents, appointment of the Receiver primarily as provided for "as a matter of right" by the Security Agreement and Note, but also pursuant to Fed. R. Civ. P. 66 and C.R.S. 38-38-602(3). Docket No. 1.

23. On January 18, 2024, Leonite filed its Motion to Appoint Receiver, requesting that the Court appoint Mr. Stevens as receiver and impose a blanket stay to prevent interference with the receivership estate pursuant to the express terms of the Security Agreement and Note, F.R.C.P. 66(a), and Colorado law. Docket No. 3.

24. On February 1, 2024, the Court entered its Order Appointing Receiver, which found, among other things, that Fed. R. Civ. P. authorizes the Court to appoint a receiver, that the parties agreed to appointment of a receiver, agreed to be bound, by Colorado law, and that Colorado law authorizes the appointment of a receiver under the circumstances present in this case, and stayed all actions against HSLLC and HSW. Docket No. 18.

25. On April 25, 2024, HBDC filed its Motion to Intervene, requesting authorization to intervene as a defendant in this action. Docket No. 26.

26. On May 31, 2024, HBDC filed its Motion to Dismiss Complaint, seeking an order dismissing the claim with prejudice pursuant to Fed. R. Civ. P. 12(b), terminating the Receiver's appointment, and lifting the stay imposed on HBDC's Hawaii Litigation and any other stayed cases (the "Motion to Dismiss"). Docket No. 39.

## ARGUMENT

27. In its Motion to Dismiss, HBDC asserts that this Court lacks subject matter jurisdiction due to incomplete diversity of citizenship between the parties and that the Complaint does not provide a cognizable cause of action.

28. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Walker v. Mohiuddin*, 947 F.3d 1244, 1248-49 (10th Cir. 2020) (internal quotation marks omitted).

29. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019) (internal quotation marks omitted).

30. "The complaint does not need detailed factual allegations, but the factual allegations must be enough to raise a right to relief above the speculative level." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1234 (10th Cir. 2020) (internal quotation marks omitted).

31. Rule 8(a) of the Federal Rules of Civil Procedure requires a pleading to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and requires only that a complaint contain enough factual details to render the entitlement to relief plausible, *Jones v. Needham*, 856 F.3d 1284, 1292 (10th Cir. 2017).

### ***A. The Complaint Satisfies the Pleading Requirements of Fed. R. Civ. P. 8(a)(2) by Containing a Short and Plain Statement of the Grounds for the Court's Subject Matter Jurisdiction Pursuant to 28 U.S.C.A. § 1332 Based on the Parties' Complete Diversity of Citizenship***

32. 28 U.S.C. § 1332(a) provides as follows:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--
>
> (1) citizens of different States;
>
> (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;
>
> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
>
> (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

33. Diversity jurisdiction requires complete diversity—i.e., "no plaintiff may be a citizen of the same state as any defendant." *Grynberg v. Kinder Morgan Energy Partners, L.P.*, 805 F.3d 901, 905 (10th Cir. 2015).

34. "For diversity purposes, a limited liability company 'takes the citizenship of all its members.'" *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1234 (10th Cir. 2015) (quoting *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1014 (10th Cir. 2018), as revised (Apr. 13, 2018)).

35. Allegations of diversity jurisdiction must be pled affirmatively. *See Penteco Corp. Ltd. Partnership-1985A v. Union Gas Sys., Inc., 929 F.2d 1519, 1521* (10th Cir. 1991) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(1) (pleading must contain "a short and plain statement of the grounds for the court's jurisdiction").

36. When considering whether the operative pleading facially sets forth sufficient facts to establish subject matter jurisdiction, the court takes the allegations in the complaint as true. *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n.1 (10th Cir. 2012).

37. As asserted in the Complaint, Leonite "is a limited partnership with a principal place of business in Spring Valley, New York." *Complaint* at ¶ 1. "Leonite's sole general partner is Leonite Advisors LLC," which "has three individual members who reside in New York and New Jersey." *Complaint* at ¶¶ 1-3.

38. Also as asserted in the Complaint, HSLLC "has two members, one of which resides in California and the other is HSW Holdings Corporation," which has "its principal place of business located in Hawaii." *Complaint* at ¶¶ 6, 7.

39. The Complaint thus contains "a short and plain statement of the grounds for the court's jurisdiction" pursuant to 28 U.S.C. § 1332. *See* Fed. R. Civ. P. 8(a)(1).

40. HBDC argues that, contrary to the allegations contained in Leonite's well-plead Complaint, HSLLC's Unanimous Written Consent establishes that Leonite is a member of HSLLC because Leonite's signature block was included under the "Member" section, and that this destroys diversity of citizenship because Leonite and HSLLC reside in the same state and therefore dismissal is proper under Rule 12(b)(1). *See Motion to Dismiss* at p. 2.

41. Leonite is not now and has never been a member of either HSLLC or HWS. See Affidavit of Avi Geller, attached hereto as Exhibit 1.

42. As counsel for Leonite explained to counsel for HBDC, which explanation HBDC quotes in its Motion to Dismiss, Leonite is not a member of HSLLC and was included as a signature because Leonite's counsel "wished to document (and for the other signers to see) that Leonite was consenting to the appointment of a Receiver. Because of the significant time urgency, [counsel] rushed to circulate the document and failed to clarify Leonite's role – which is lender and not a member." *See Motion to Dismiss* at p. 3.

43. As additional proof that Leonite is not and was not a member of HSLLC, Leonite provided HBDC with its Operating Agreement.[2] *See Motion to Dismiss* at p. 3. The Operating Agreement, dated June 16, 2020, identifies the members of HSLLC as HSW and Lewis I Cohen. *See Limited Liability Company Agreement of Hawaiian Springs, LLC*, attached hereto as Exhibit 2.

44. HBDC continues to demand that Leonite provide additional evidence to prove a negative—that it was not at the time it filed the Complaint a member of HSLLC.

45. Though Leonite is not presently aware of any documentary evidence establishing that Leonite was not a member of HSLLC on the precise date of January 18, 2024, Leonite is prepared to testify that, as it has repeatedly explained to HBDC and consistent with the allegations in the Complaint, Leonite is not and has never been a member of HSLLC. *See* Exhibit 1 at ¶ 6.

46. HBDC further asserts that "Leonite has engaged in questionable strategy in bringing this case in this District." *Motion to Dismiss* at p. 5. To be clear, Leonite, HSLLC, and HSW agreed on this venue for jurisdiction of any legal proceedings involving the appointment of a receiver for HSLLC and/or HSW, and any related matters and because the Receiver, experienced in the matters at hand, is located in Colorado, and generally speaking legal costs are lower in Colorado than in Hawaii or New York. *See* Exhibit 1 at ¶7. This is not a "questionable strategy"—rather it is a sound business decision that effects the terms of the parties' contractual agreement, is consistent with the location of the highly qualified and experienced receiver and promotes a financial benefit to all parties and parties in interest.

[2] HSLLC can issue Leonite interests in HSLLC but has not done so.

47. Based on the foregoing, complete diversity of jurisdiction exists and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Accordingly, the Motion to Dismiss should be denied.

48. In the unlikely event the Court determines that Leonite has failed to sustain its burden of establishing that this Court has subject matter jurisdiction, the Complaint should be dismissed without prejudice, not with prejudice as proposed by HBDC. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1217 (10th Cir. 2006) (observing that once a court determines it lacks subject matter jurisdiction to make any determination of the merits of the underlying claim, it must dismiss without prejudice).

***B. The Complaint Satisfies the Pleading Requirements of Fed. R. Civ. P. 8(a)(2) by Containing a Short and Plain Statement of the Claim Showing Leonite is Entitled to Relief***

49. Fed. R. Civ. P. 8(a) provides that a complaint "must contain (1) a short and plain statement of the grounds for the court's jurisdiction, ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought."

50. The requirements of Fed. R. Civ. P. 8 are designed to ensure satisfaction of the dual purposes of a complaint, which are to give the opposing party fair notice of the basis for the claims against it so that it may respond and to allow the Court to establish whether the allegations, if proven, show that the plaintiff is entitled to relief. *See Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1480 (10th Cir. 1989).

51. HBDC asserts that the Complaint fails to state a cause of action as required by Fed. R. Civ. P. 8(a)(2) because "Appointment of a Receiver" is not itself a cause of action. *See Motion to Dismiss* at p. 4.

52. In support of this position, HBDC cites *Gordon v. Washington,* 295 U.S. 30, 37 (1935) and *Genesis Capital, LLC v. Lauravin Luxury Apartments Homes, LLC*, Civil Action No. 23-795 (JEB), 2023 U.S. Dist. LEXIS 84754, at *6 (D.D.C. May 15, 2023). The cases relied upon by HBDC are not analogous to the instant action as in each of those cases, the plaintiff sought the equitable appointment of a receiver, and not appointment pursuant to the express terms of a contract.

53. Here, Leonite's Complaint primarily seeks appointment of a receiver pursuant to the express terms of the Security Agreement. Thus, it is in effect an action to enforce a contract—the Security Agreement.

54. Leonite's Complaint contains a short and plain statement of the claim showing that Leonite is entitled to relief: The Security Agreement and Note provide for appointment of a receiver as a matter of right upon an Event of Default, *Complaint* at ¶¶ 18, 23, 34; an Event of Default has occurred, *Complaint* at ¶¶ 21, 27, 28; the default remains uncured, *Complaint* at ¶ 28; and the parties have agreed to the appointment of Mr. Stevens as receiver, *Complaint* at ¶¶ 29, 30, 32, 35. *See* Fed. R. Civ. P. 8(a)(2).

55. HSLLC and HWS did not dispute these allegations, and in fact consented to the appointment of the Receiver.

56. The Complaint thus easily satisfies the pleading requirements of Rule 8 and provides HSLLC, HSW, and HBDC fair notice of the claim being asserted and allows them an opportunity to meaningfully respond. *See* Fed. R. Civ. P. 8(a). Indeed, HBDC does not assert that it cannot understand the claim subject of the Complaint or that it is somehow deprived of a meaningful opportunity to respond. *See generally Motion to Dismiss.*

57. In the event that the Court determines that the Complaint fails to state a claim showing that Leonite is entitled to relief, Leonite respectfully requests leave to amend its Complaint to assert the claim for breach of contract referenced in paragraph 21 above.

58. In fact, Leonite has drafted an amended Complaint and Motion to allow for the filing of the amended Complaint, copies which are attached hereto as Exhibit 3 and 4. Leonite however does not want to file these documents and trigger a procedure that cannot be unwound and that will incur cost and expense for all parties that, is unwarranted, unless so ordered by the Court.

### ***C. Equitable Considerations***

59. HBDC's actions show its real goal is to vacate the stay entered by this Court on February 1, 2024, so that it alone may recover the amounts allegedly owed to it by Defendants at the expense of all other creditors. Sure enough, barely a week after its motion to intervene was granted by this Court, HBDC filed its Motion to Dismiss for Lack of Jurisdiction and Motion to

Dismiss for Failure to State a Claim. These were followed in short order by HBDC's motion to lift the stay. And, exactly as Leonite expressed concern about to this Court, HBDC is now laser-focused on ending the stay and effectively destroying the Receiver's ability to turn around Defendants' business.

60. The Receiver is a neutral party, acting in the best interests of all parties in interest, with the goal of maximizing the return for all creditors.

61. No action being taken in this receivership is harming the interests of HBDC, as it is Plaintiff's understanding that the Receiver is meeting the contractual obligations of HBDC.

62. As all parties acknowledge, the Defendants' business, and in turn the efforts of the Receiver, turn on the access to the leased real property.

63. HBDC's actions are self-servingly designed to deny the Defendants and in turn the Receiver's access to the leased real property for the benefit of HBDC and to the detriment of all other creditors.

**CONCLUSION**

WHEREFORE, Plaintiff Leonite Fund I, LP respectfully requests that this Court deny Defendant Hawaii Brewery Development Co., Inc.'s Motion to Dismiss Complaint and grant such other and further relief as the Court deems proper

Dated: June 21, 2024 Respectfully submitted,

*/s/ Aaron A. Garber*
Aaron A. Garber, #36099
WADSWORTH GARBER WARNER CONRARDY, P.C.
2580 West Main Street, Suite 200
Littleton, Colorado 80120
Telephone: (303) 296-1999
Telecopy: (303) 296-7600
agarber@wgwc-law.com

And

Zvi Raskin, Esquire
1 Hillcrest Center Drive
Suite 230
Spring Valley, New York 10977
Telephone: 845.202.3999
E-Mail: zr@raskinlegal.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on June 21, 2024, I served by prepaid first class mail a copy of **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COMPLAINT** on all parties against whom relief is sought and those otherwise entitled to service at the following addresses:

Tracy L. Ashmore
tashmore@rwolaw.com,hstahl@rwolaw.com

Stephen E. Kapnik
skapnik@lohfshaiman.com,ljohnson@lohfshaiman.com

Alan Stewart Thompson
athompson@lohfshaiman.com,aculligan@lohfshaiman.com

*/s/ Nichole Garber*
For Wadsworth Garber Warner Conrardy P.C.

**EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:24-cv-00149-NYW-STV

LEONITE FUND I, LP,

Plaintiff,

v.

HAWAIIAN SPRINGS, LLC and HSW HOLDINGS CORPORATION,

Defendants,

and

HAWAII BREWERY DEVELOPMENT CO., INC.,

Defendant, Counterclaimant, and Cross-claimant.

**AFFIDAVIT OF AVI GELLER IN SUPPORT OF PLAINTIFF'S RESPONSE TO MOTION TO DISMISS COMPLAINT BY DEFENDANT HAWAII BREWERY DEVELOPMENT CO., INC.**

I, Avi Geller, in my capacity as manager of Leonite Fund I, LP ("Leonite"), plaintiff in this proceeding, do hereby state, depose and affirm the following to the best of my knowledge:

1. I submit this Affidavit in support of Leonite's Response to Motion to Dismiss Complaint by Defendant Hawaii Brewery Development Co., Inc. (the "Response").

2. A true and correct copy of the Limited Liability Company Agreement of Hawaiian Springs, LLC (the "Operating Agreement") is attached to the Response as Exhibit 2.

3. As reflected in the Operating Agreement, Hawaiian Springs, LLC has two members: HSW Holdings Corp. and Lewis Cohen.

4. Mr. Cohen and HSW Holdings Corp. own 60% and 40%, respectively, of Hawaiian Spring LLC.

5. HSW Holdings Corp. and Lewis Cohen are now and have always been the only members of Hawaiian Springs, LLC.

6. Leonite has is not now and has never been a member of Hawaiian Springs, LLC.

7. Colorado was chosen by Leonite, with the consent of the Defendants, because the receiver is located in Colorado, is experienced in the matters at hand, and it is believed the cost and expense of the receivership will be lower is litigated and managed in Colorado as compared to Hawaii or New York.

Avi Geller

SUBSCRIBED AND SWORN before me this 20th day of June 2024 by Avi Geller.

Witness my hand and official seal.

Notary Public

YECHESKEL BERMAN
NOTARY PUBLIC
STATE OF NEW JERSEY
ID #50121638
MY COMMISSION EXPIRES 1-31-2025

EXHIBIT 2

**EXECUTION VERSION**

LIMITED LIABILITY COMPANY AGREEMENT
OF
HAWAIIAN SPRINGS, LLC

This Limited Liability Company Agreement (this "**Agreement**") is made and entered into as of June 16, 2020 by and among Hawaiian Springs, LLC, a limited liability company organized under the laws of the State of Delaware (the "**Company**"), HSW Holdings Corporation, Lewis I. Cohen and such other Persons who shall be admitted in accordance with the terms hereof and shall have agreed to be bound hereby (collectively, the "**Members**"), for the purpose of governing the affairs of the Company and the conduct of its business.

## RECITALS

WHEREAS, the Company was formed as a limited liability company on August 3, 1999 by the filing of a Certificate of Formation with the office of the Secretary of State of the State of Delaware pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "**Act**");

WHEREAS, effective June 16, 2020, HSW Holdings Corporation purchased one hundred percent of the membership interests in the Company from an unrelated thirty party;

WHEREAS, as of March 30, 2021, Mr. Cohen has contributed to the Company in the aggregate $1,565,000 in cash, which such contributions were made in tranches over the course of 2020 and through February 2021;

WHEREAS, as of March 30, 2021, Mr. Cohen and HSW Holdings Corporation owned 60% and 40%, respectively, of the membership interests of the Company; and

WHEREAS, the Company, Mr. Cohen and HSW Holdings Corporation desire to set forth in writing below the previously agreed upon terms and to memorialize the membership interests of the Company.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree hereto as follows:

## ARTICLE 1

## GENERAL PROVISIONS

Section 1.1 **Definitions**. For convenience and brevity, certain terms used in this Agreement, are defined in Exhibit A instead of when first used in this Agreement.

Section 1.2 **Formation**. By the filing of the Certificate of Formation with the Secretary of State of the State of Delaware on August 3, 1999 (the "**Certificate**"), the Company was formed pursuant to the Act for the purposes hereinafter set forth. The Company was formed as a limited liability company managed by managers under the laws of the State of Delaware, upon the terms and conditions hereinafter set forth. The Members shall execute or cause to be executed all necessary certificates and documents, and shall make all such filings and recordings, and shall do all other acts as may be necessary or appropriate from time to time to comply with all requirements for the formation, continued existence and operation of a limited liability company in the State of Delaware. This Agreement is intended to serve as a "limited liability company agreement" as such term is defined in § 18-101(7) of the Act.

Section 1.3 **Company Name and Address**. The Company shall do business under the name "Hawaiian Springs, LLC" or such other name as the Manager may determine from time to time. The Company shall promptly notify the Members of any change of name of the Company. The registered agent for the Company shall be William J. Caragol. The registered office of the Company required to be maintained in the State of Delaware is as provided in the Certificate or such other registered office (which shall not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by law. The Company may also have offices at such other places within or outside of the State of Delaware as the Manager may from time to time determine.

Section 1.4 **Term**. The Company shall commence operating as of the date the Certificate is filed with the Secretary of State of the State of Delaware, and shall have a perpetual existence, unless sooner terminated in accordance with the provisions of this Agreement or by operation of law (the "**Term**").

Section 1.5 **Business of the Company**. The Company may carry on any lawful business, purpose or activity for which limited liability companies may be organized under the Act. The Company shall possess and may exercise all the powers and privileges granted by the Act or by any other law, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

Section 1.6 **Fiscal Year**. The Fiscal Year of the Company shall begin on January 1 and end on December 31 of each calendar year. The Company's taxable year shall mirror the Fiscal Year unless otherwise required by applicable tax law.

Section 1.7 **Partnership Status**. The Members intend that the Company be treated as a partnership for all federal and, state or local income tax purposes, and the Company and each Member will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment except to the extent otherwise required by applicable law. Without the unanimous consent of the Members, no tax election shall be made that is inconsistent with the foregoing intent. Except as provided in the first sentence of this Section 1.7, the Members do not intend the Company to be a partnership or joint venture, or that any Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than tax purposes, and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.

## ARTICLE 2

## MANAGEMENT

Section 2.1 **Management of the Company Generally**. The business and affairs of the Company shall be managed by its Manager. No Member shall have any power or authority to bind the Company unless the Member has been expressly authorized by the Manager to act as an agent of the Company. Unless authorized to do so by this Agreement or by the Manager of the Company, no officer, employee, or agent of the Company other than the Manager shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. Except as otherwise expressly required by this Agreement or by non-waivable provision of the Act, the Manager shall have full and complete authority, power and discretion to direct, manage and control the business, affairs and properties of the Company and to supervise the officers of the Company. The Manager may delegate, at any time and from time to time, such authority, power and discretion (or any portion thereof) to one or more officers, employees or agents of the Company.

Section 2.2 **Authority and Certain Powers of Manager**. Without limiting the generality of Section 2.1 above, the Manager shall have the power and authority, on behalf of the Company:

(a) To do and perform all acts as may be necessary or appropriate to the conduct of the Company's business;

(b) To purchase, hold, sell, exchange, transfer and otherwise acquire and dispose of and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to real and personal property, whether tangible or intangible, held by the Company;

(c) To purchase liability and other insurance to protect the Company's property and business;

(d) To execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases, partnership agreements, operating agreements of other limited liability companies and any other instruments or documents necessary to or desirable for, in the opinion of the Manager, the business of the Company;

(e) To employ accountants, legal counsel, managing agents, or other experts or consultants to perform services for the Company and to compensate them from the Company's funds; and

(f) To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager may approve.

Section 2.3 **Reliance by Third Parties**. Persons dealing with the Company are entitled to rely conclusively upon a certificate of the Manager to the effect that such Manager is then acting as the Manager and upon the power of the Manager as herein set forth. Persons dealing with the Company shall be entitled to rely on a certificate of any officer of the Company as conclusive evidence of the incumbency of any officer of the Company and his or her authority to take action on behalf of the Company and shall be entitled to rely on a copy of any resolution or other action taken by the Manager, certified by any officer of the Company, as conclusive evidence of such action and of the authority of the officer referred to in such resolution or other action to bind the Company to the extent set forth therein.

Section 2.4 **No Personal Liability.** Except as otherwise provided in the Act, by applicable law or expressly in this Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

Section 2.5 **Resignation**. The Manager of the Company may resign at any time by giving written notice to the Company. The resignation of the Manager shall be effective upon receipt of such notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make such resignation effective. The resignation of a Manager who is also a Member shall not affect such Person's rights as a Member and shall not constitute a withdrawal of a Member.

Section 2.6 **Removal**. The Manager may be removed from office at any time, without assigning any cause, by affirmative vote or written consent of a Majority in Interest. The removal of a Manager who is also a Member shall not affect such Person's rights as a Member and shall not constitute such Person's withdrawal as a Member.

Section 2.7 **Vacancies**. Any vacancy with respect to the Manager occurring for any reason shall be filled by the affirmative vote or written consent of a Majority in Interest.

Section 2.8 **Bank Accounts**. The Manager may from time to time (i) designate such bank or banks as he/she/it may deem necessary or desirable as depositories (the "**Depository**" or "**Depositories**") for the funds of the Company, (ii) open, keep and close general and special bank accounts and safe deposit boxes with any Depository, (iii) cause to be deposited in accounts with any Depository from time to time such funds of the Company as he may deem necessary or advisable, (iv) designate from time to time officers and agents of the Company who will be authorized to sign or countersign checks, drafts or other orders for the payment of money issued in the name of the Company against any such accounts, and (v) make such general and special rules and regulations with respect to such accounts (including without limitation authorization of use of facsimile signatures) as he may deem necessary or advisable.

Section 2.9 **Compensation**. The Manager shall be entitled to compensation for his/her/its services as the Manager, which amount is not subject to any approval by the Members.

Section 2.10 **Determination of Fair Market Value.** Valuations of the Company or property of the Company shall be conducted at such times as required by this Agreement or as otherwise deemed appropriate by the Manager. Except as otherwise provided herein, determinations of "**Fair Market Value**" shall be made by the Manager in his/her/its reasonable discretion (and with the aid of a formal third party valuation report when deemed necessary or advisable by the Manager in order to apply the terms of this Agreement or comply with applicable laws).

## ARTICLE 3

## MEMBERS

Section 3.1 **Admission of Members**.

(a) A Person acquiring any Units in the Company in connection with its formation is admitted as a Member of the Company upon the later to occur of the formation of the Company or when the admission of the Person is reflected in the Membership Interest Registry (the "**Registry**") of the Company.

(b) The Manager shall promptly cause the Registry to be amended to reflect the issuance of additional Units to a new or existing Member. As a condition to the issuance of such Units, each new Member shall execute an instrument under which the Member agrees to be bound as a Member by the terms and conditions of this Agreement and each existing Member shall acknowledge and agree that Member continues to be bound by the terms and conditions of this Agreement with respect to all Units held by such Member.

Section 3.2 **No Personal Liability**. Except as otherwise provided in the Act, by applicable law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 3.3 **Business Transactions of Members or Manager with the Company**. A Member or the Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with the Company and, subject to applicable law, has the same rights and obligations with respect to any such matter as a person who is not a Member or Manager.

# ARTICLE 4

# OFFICERS

Section 4.1 **Officers.** The Company may appoint any officers as may be elected in accordance with the provisions of this ARTICLE 4. Officers may but need not be the Manager or Members of the Company. Any number of offices may be held by the same person.

Section 4.2 **Election, Term of Office and Resignations**.

(a) Election and Term of Office. The officers of the Company shall be elected by the Manager, and each such officer shall hold office for such period, have such authority, and perform such duties as the Manager may from time to time determine.

(b) Resignations. Except as may be otherwise provided in an officer's employment agreement with the Company, (i) any officer may resign at any time upon written notice to the Company, and (ii) the resignation shall be effective upon receipt thereof by the Company or at such subsequent time as may be specified in the notice of resignation. An officer may be obligated under additional terms and conditions set forth in his or her employment agreement with regard to any resignation or termination of employment, including with regard to the return of any confidential or proprietary information of the Company, ongoing confidentiality or non-competition obligations and the orderly transition of his or her responsibilities to a permanent or interim successor.

Section 4.3 **Removal of Officers and Agents**. Election or appointment of an officer or agent shall not of itself create contract rights. Any officer may be removed by the Manager with or without cause.

Section 4.4 **Authority**. All officers of the Company, as between themselves and the Company, shall have such authority and perform such duties in the management of the Company as may be provided by or pursuant to resolutions or orders of the Manager.

Section 4.5 **Salaries**. The salaries, bonuses and other compensation of the officers and other employees, if any, shall be determined from time to time by the Manager. No officer shall be prevented from receiving such salary or other compensation by reason of the fact that the officer is also the Manager or a Member.

# ARTICLE 5

# EXCULPATION; INDEMNIFICATION

Section 5.1 **Exculpation of Covered Persons**.

(a) Covered Persons. As used herein, the term "**Covered Person**" shall mean (i) each Member; (ii) each officer, director, stockholder, partner, member, Affiliate, employee, agent or representative of each Member, and each of their Affiliates; and (iii) each Manager, officer, employee, agent or representative (including without limitation the Partnership Tax Representative) of the Company.

(b) Standard of Care. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in his, her or its capacity as a Covered Person, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c) Good Faith Reliance. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, income or losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Act.

Section 5.2 **Liabilities and Duties of Covered Persons**.

(a) Limitation of Liability. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b) Duties. Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), such Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other applicable law.

Section 5.3 **Indemnification**.

(a) Indemnification. To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement, only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, taxes or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect subsidiary of the foregoing in connection with the business of the Company; or

(ii) such Covered Person being or acting in connection with the business of the Company as a member, stockholder, Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Affiliates, or that such Covered Person is or was serving

at the request of the Company as a member, manager, director, officer, employee or agent of any Person including the Company;

*provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and within the scope of such Covered Person's authority conferred on him or it by the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his/her/its conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct.

(b) Control of Defense. Upon a Covered Person's discovery of any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 5.3, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit or proceeding; *provided*, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 5.3, unless the Company shall have been materially prejudiced thereby. Subject to the approval of the disinterested Members, the Company shall be entitled to participate in or assume the defense of any such claim, lawsuit or proceeding at its own expense. After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend or defending any such claim, lawsuit or other proceeding. If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit or proceeding, the Covered Person shall have the right to assume the defense of any such claim, lawsuit or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed).

(c) Reimbursement. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 5.3; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 5.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d) The indemnification provided by this Section 5.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 5.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 5.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e) Insurance. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f) Funding of Indemnification Obligation. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 5.3 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g) Savings Clause. If this Section 5.3 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 5.3 to the fullest extent permitted by any applicable portion of this Section 5.3 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(h) Amendment. The provisions of this Section 5.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 5.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 5.3 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

(i) Survival. The provisions of this Section 5.3 shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE 6

## CAPITALIZATION

Section 6.1 **Membership Interests.**

(a) The Membership Interests of the Members in the Company shall be represented by issued and outstanding Units, with each Unit having the respective rights and privileges, including voting rights, if any, set forth in this Agreement.

(b) The Company has authorized for issuance of one class of Units. The total number of Units which the Company may issue is 100.

Section 6.2 **Ownership Exhibit, Capital Contributions.**

(a) The Members have made a Capital Contribution of cash and certain other property as set forth on Exhibit B in exchange for the issuance of the number of Units set forth on Exhibit B.

(b) The Company shall maintain Exhibit B to this Agreement as a schedule of all Members, which shall set forth their respective addresses, the number of Units held by them, their Percentage Interest, the Capital Contributions, if any made by them and the Capital Account Balance. Exhibit B shall be amended from time to time by the Manager to reflect, to the extent required in accordance with the terms of this Agreement, the admission of additional Members to the Company, additional Capital Contributions, changes in the number of issued and outstanding Units, and changes in the ownership of Units.

(c) The Company shall be entitled to treat the Person in whose name any Unit(s) of the Company stand on the books of the Company as the absolute owner thereof, and shall not be bound to recognize any equitable or other claim to, or interest in, such Unit or Units on the part of any other Person.

Section 6.3 **Additional Capital Contributions**. No Member shall be obligated to make any additional Capital Contribution or advance to the Company.

Section 6.4 **Use of Capital Contributions**. The Capital Contributions made pursuant to this ARTICLE 6 shall be used, together with other funds available to the Company, to engage in the business of the Company and for the payment of the liabilities and obligations of the Company.

Section 6.5 **No Interest on or Return of Capital**. No Member shall be entitled to interest on any Capital Contribution or Capital Account. No Member shall have the right to demand or receive the return of all or any part of any Capital Contribution or Capital Account, except as otherwise may be expressly provided herein, and no Member shall be personally liable for the return of the Capital Contribution of any other Member.

Section 6.6 **Loans by Members**. If any Member or Affiliate of a Member shall lend money to the Company, the amount of any such loan shall not be an increase of its Capital Contribution or Capital Account or, except as otherwise provided herein, affect in any way its share of the profits, losses or Distributions of the Company but shall be a debt due from the Company and repaid as provided therein.

## ARTICLE 7

## CAPITAL ACCOUNTS AND ALLOCATIONS

Section 7.1 **Capital Accounts**. A capital account shall be maintained for each Member in accordance with the Regulations issued under Section 704(b) of the Code (each such account, a "**Capital Account**"). The Manager may, upon the occurrence of any of the events specified in Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such Regulations and Regulations Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property.

Section 7.2 **Allocations**. Subject to Section 7.3, items of Company income, gain, loss, expense or deduction (and items thereof) for any relevant period shall be allocated to the Capital Accounts of the Members so as to ensure, to the extent possible, that the Capital Accounts of the Members as of the end of such period are equal to (a) the aggregate distributions that the Members would be entitled to receive if all of the assets of the Company were sold for their book value (determined according to the rules of Regulations Section 1.704-1(b)(2)(iv)), the liabilities of the Company were paid in full (except that non-recourse liabilities shall be paid only to the extent, with respect to each asset subject to a non-recourse liability, that the non-recourse liability does not exceed the book value of such asset), and the remaining proceeds were distributed as of the end of such period in accordance with Section 10.4 minus (b) each Member's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain and each partner's share of Specified Capital Transaction Gain as provided in Section 7.3(f), computed immediately prior to the hypothetical sale of assets. The allocations made pursuant to this Section 7.2 are intended to comply with the provisions of Section 704(b) of the Code and the Regulations thereunder and, in particular, to reflect the Members' economic interests in the Company as set forth in this Agreement, and this Section 7.2 shall be interpreted in a manner consistent with such intention. The Manager may adjust allocations as it determines necessary or appropriate to best reflect the Members' economic interests in the Company and ensure compliance with the Code and Regulations.

Section 7.3 **Regulatory Allocations**.

(a) Qualified Income Offset. If any Member unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) and such adjustment, allocation or distribution causes or increases a deficit in such Member's Capital Account (a "**Deficit**"), items of gross income and gain for such Fiscal Period and each subsequent Fiscal Period shall be specifically allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 7.3(a) shall be made only if and to the extent that such Member would have a Deficit after all other allocations provided for in this ARTICLE 7 have been tentatively made as if this Section 7.3(a) were not in this Agreement. This Section 7.3(a) is intended to comply with the qualified income offset provision of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(b) Partnership Minimum Gain. Except as otherwise provided in Regulations Section 1.704-2(f), if there is a net decrease in Partnership Minimum Gain during any Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period in proportion to, and to the extent of, an amount equal to the portion of such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). This Section 7.3(b) is intended to comply with the chargeback of items of income and gain requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(c) Nonrecourse Deductions. Except as otherwise determined by the Manager, Nonrecourse Deductions shall be allocated to the Members in accordance with their Units. For purposes of this Section 7.3(c), the term "**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1).

(d) Partner Nonrecourse Debt. Notwithstanding any other provisions of this ARTICLE 7, to the extent required by Regulations Section 1.704-2(i), any items of income, gain, deduction and loss of the Company that are attributable to a nonrecourse debt of the Company that constitutes Partner Nonrecourse Debt (including chargebacks of Partner Nonrecourse Debt Minimum Gain) shall be allocated in accordance with the provisions of Regulations Section 1.704-2(i). This Section 7.3(d) is intended to satisfy the requirements of Regulations Section 1.704-2(i) (including the partner nonrecourse debt chargeback requirements) and shall be interpreted and applied in a manner consistent therewith.

(e) Special Allocation of 2020 Losses. Notwithstanding any other provision of this Agreement, one hundred percent (100%) of the Company's items of loss, deduction and expense for the Company's 2020 taxable year shall be allocated to Mr. Cohen.

(f) Special Allocation of Specified Capital Transaction Gain. Notwithstanding any other provision of this Agreement, subsequent to any allocation made pursuant to Section 7.3(e), one hundred percent (100%) of the Company's items of gain shall first be allocated to Mr. Cohen to the extent necessary so as, to the extent possible, Mr. Cohen has been allocated cumulative items of gain as of the close of the relevant Fiscal Period equal to the allocation of items of loss, deduction and expense in accordance with Section 7.3(e) ("**Specified Capital Transaction Gain**").

Section 7.4 **Section 704(c) of the Code**. The Members agree that to the fullest extent possible with respect to the allocation of depreciation and gain for federal (and state and local) income tax purposes only, Section 704(c) of the Code will apply with respect to any noncash property contributed to the Company by any Member using such permissible method as may be determined by the Manager. For purposes hereof, any allocation of income, loss, gain or any item thereof to a Member pursuant to Section 704(c) of the Code will affect only that Member's tax basis in its interest in the Company and will not affect that Member's Capital Account. In addition to the foregoing, if Company assets are reflected in the Capital

Accounts of the Members at a book value that differs from the adjusted tax basis of the assets (e.g., because of a revaluation of the Members' Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(f)), allocations of depreciation, amortization, income, gain or loss with respect to such assets will be made among the Members in such a manner as determined by the Manager and consistent with the principles of Section 704(c) of the Code and the Regulations thereunder.

Section 7.5 **Allocations in Respect of Transfers**. All items of income, gain, loss, expense, deduction and credit allocable in respect of an interest in the Company that has been transferred shall be allocated between the transferor and the transferee based on an interim closing of the books on the date of transfer (unless a different method is consented to by the transferor and the Manager at the time of such transfer); provided, however, that this allocation shall be made in accordance with a method permissible under Code Section 706 and the Regulations thereunder.

Section 7.6 **Tax Consequences**. The Members are aware of the income tax consequences of the allocations made by this ARTICLE 7 and hereby agree to be bound by the provisions of this ARTICLE 7 in reporting their shares of Company income, gain, loss and deduction for federal income tax purposes.

Section 7.7 **No Deficit Funding Obligation**. Except as otherwise expressly required by law or this Agreement, no Member shall be required to reimburse the Company for any negative balance in such Member's Capital Account or restore any negative Capital Account of another Member.

## ARTICLE 8

## DISTRIBUTIONS

Section 8.1 **Distributions of Net Cash Flow**. From time to time, at the Manager's sole discretion, Net Cash Flow for each fiscal year (or such shorter period for which the distribution is made) may be distributed to the Members, and all such distributions to the Members shall be made, if at all, in proportion to their respective Percentage Interests.

Section 8.2 **Capital Transaction Proceeds**. Capital Transaction Proceeds shall be distributed to the Members within a reasonable time following the Capital Transaction to which the Capital Transaction Proceeds relate in accordance with Section 8.1.

Section 8.3 **Limitations on Distributions**. The Company shall not make a Distribution to a Member to the extent that at the time of the Distribution, after giving effect to the Distribution, all liabilities of the Company, other than liabilities to Members on account of their interests in the Company and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the assets of the Company, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the fair value of that property exceeds that liability.

Section 8.4 **Distribution In Kind**. Distributions of Property of the Company may be made in cash or in kind as determined by the Manager. Such Property of the Company shall be distributed to the Members in the same order and priority as the Members would have been entitled to with respect to cash distributions pursuant to Section 8.1. No Member shall have the right to sue for a partition of Property of the Company with respect to a distribution made pursuant to this Section 8.4 and the Company shall have the right to distribute Property of the Company to the Members entitled thereto pursuant to this Section 8.4 as tenants in common in the same proportions in which such Members would have been entitled to cash Distributions pursuant to Section 8.1.

Section 8.5 **Withholding Taxes**. All amounts withheld or required to be paid by the Company pursuant to the Code or any federal, state, local or non-U.S. tax law with respect to any payment, distribution, ownership by or allocation to a Member, or which the Company is otherwise obligated to pay to any governmental agency because of the status of a Member of the Company (including by virtue of Code Section 1446(f) or the Audit Rules and further including any interest, penalties and expenses associated with such payments), will, to the extent so withheld and/or paid over to such governmental agency, be treated as amounts paid or distributed, as applicable, to such Member for all purposes of this Agreement. The Manager is authorized to withhold from distributions to Members, or to pay with respect to allocations to Members, and in each case to pay over to the appropriate federal, state, local or non-U.S. government any amounts required to be so withheld or paid.

## ARTICLE 9

## TRANSFERABILITY

Section 9.1 **Dispositions of Membership Interests**. Except as expressly provided by this Agreement, a Member may not make a sale, assignment, transfer, conveyance, gift, exchange, or other disposition (voluntarily, involuntarily, or by operation of law) ("**Disposition**") of all or any of such Member's Units without the consent of the Manager and otherwise in accordance with the provisions of this Agreement.

Section 9.2 **Disposition by a Member**. Subject to Section 9.1, in the event a Member shall undertake a Disposition of any of such Member's Units, whether by reason of death, voluntary or involuntary Disposition, or otherwise, to any person or entity who is not already a Member at the time of the Disposition, then (a) the transferee of such interest shall be an assignee of such interest in accordance with the Act, but shall not be a Member unless and until expressly admitted to the Company as provided in ARTICLE 9; and (b) the Company and the Members shall have the rights and options provided for in this ARTICLE 9.

Section 9.3 **Effect of Transfer**.

(a) No assignee or transferee of all or part of a Membership Interest shall have the right to become admitted as a Member, unless and until:

(i) the assignee or transferee has executed an instrument reasonably satisfactory to the Company by which the assignee or transferee accepts and adopts the provisions of this Agreement;

(ii) the assignee or transferee has paid all reasonable expenses of the Company requested to be paid by the Company in connection with the admission of such assignee or transferee as a Member;

(iii) if requested by the Company, the assignee or transferee has delivered to the Company an opinion of counsel reasonably satisfactory to the Manager that such transfer (A) is exempt from the registration requirements of the Securities Act and applicable state securities laws, (B) will not cause the Company to be treated as a publicly traded partnership under Section 7704 of the Code, (C) will not cause the Company to lose its status as a partnership for income tax purposes and (D) will not cause the Company to be subject to any withholding obligation under Section 1446(f)(4) of the Code (or any similar state, local or successor provision of law); and

(iv) such assignment or transfer shall be reflected in the Registry by the Manager.

(b) A Person who is an assignee or transferee of an interest in the Company may be admitted to the Company as a Member and may receive a Membership Interest without making a contribution or being obligated to make a contribution to the Company.

(c) The Member effecting the Disposition and the transferee shall provide the Manager with any information necessary to comply with any requirements of applicable tax law, including without limitation Sections 1446(f) and 743(e) of the Code.

Section 9.4 **Invalid Transfers Void**. Notwithstanding anything contained herein to the contrary, no transfer of an Unit may be made if such transfer (a) would violate the then applicable federal or state securities laws or rules and regulations of the Securities and Exchange Commission, state securities commissions, and any other government agencies with jurisdiction over such transfer or (b) would affect the Company's existence or qualification under the Act. Any purported transfer of any Unit or any part thereof not in compliance with this ARTICLE 9 shall be null and void *ab initio* and of no force or effect, and the transferring Member shall be liable to the other Members and the Company for all liabilities, obligations, damages, losses, costs and expenses (including reasonable attorneys' fees and court costs) arising as a result of such noncomplying transfer.

## ARTICLE 10

## DISSOLUTION AND TERMINATION

Section 10.1 **Dissolution**. The Company shall be dissolved upon the occurrence of any of the following events (each, a "**Dissolution Event**"):

(a) The affirmative vote or written consent of a Majority in Interest to dissolve the Company;

(b) The written consent of the Manager to dissolve the Company;

(c) Upon the sale by the Company of all or substantially all of its assets;

(d) Upon the Company ceasing to be taxed as a partnership for federal income tax purposes; or

(e) Upon the entry of a decree of judicial dissolution under § 18-802 of the Act.

Section 10.2 **Activities of the Company Pending Liquidation**. Upon the occurrence of a Dissolution Event, the continuing operation of the Company's business shall be confined to those activities reasonably necessary to wind up the Company's affairs, discharge its obligations, and preserve and distribute its assets.

Section 10.3 **Winding Up and Liquidation**. If a Dissolution Event occurs, then:

(a) The Manager or a liquidator or liquidating committee selected by a Majority in Interest (the "**Liquidator**") shall be responsible for the winding up of the affairs of the Company and the distribution of its assets. In connection with a winding up of the affairs of the Company, the Liquidator shall cause an accounting to be made of the assets and liabilities of the Company. If any liability is

contingent or uncertain in amount, a reserve will be established in such amount as the Liquidator deems reasonably necessary. Upon satisfaction or other discharge of such contingency, the amount of the reserve not required, if any, will be distributed as provided in Section 10.4.

(b) The Liquidator shall be entitled to receive such compensation for its services as may be approved by a Majority in Interest. The Liquidator shall agree not to resign without providing fifteen (15) days prior written notice to the Company and may be removed at any time, with or without cause, by notice of removal signed by a Majority in Interest. Upon dissolution, removal or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority in Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator will be deemed to refer also to any such successor or substitute Liquidator appointed in the manner herein provided. Except as expressly provided in this ARTICLE 10, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the Members, all of the powers conferred upon the Liquidator under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Company as provided for herein.

(c) The Liquidator shall liquidate the assets of the Company and apply and distribute the proceeds of such liquidation in the order of priority set forth in Section 10.4, unless otherwise required by mandatory provisions of applicable law.

(d) The Liquidator shall be authorized to sell any, all or substantially all of the assets of the Company for deferred payment obligations, and to hold, collect and otherwise administer any such obligations or any other deferred payment obligations held or acquired as assets of the Company.

(e) A reasonable time, including, without limitation, any time required to collect deferred payment obligations, shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Liquidator to reasonably minimize any losses attendant upon the liquidation.

Section 10.4 **<u>Distribution of Assets</u>**.

(a) In the event of a dissolution of the Company, upon the winding up of the Company, its assets shall be distributed in the following manner and order of priority:

(i) first, to creditors, including the Manager and Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has theretofore been made;

(ii) second, to the establishment of any reserves as the Liquidator may deem reasonably necessary for contingent, conditional or unmatured claims or obligations of the Company in connection with its liquidation. Such reserves shall be held by the Liquidator for the purpose of disbursing such reserves in providing for payment of any of the aforementioned contingencies, and, as soon as practicable, for distribution of the balance thereafter remaining in the manner provided in the following subdivisions of this Section 10.4; and

(iii) third, to the Members in accordance with Section 8.1, which distribution shall be made by the end of the Fiscal Year in which such termination occurs (or, if later, within ninety (90) days after the date of such termination) (the "**Final Distribution**"). Immediately prior to the Final Distribution, the Capital Account balances of the Members shall be adjusted, taking into account all contributions, distributions, and allocable items for the Fiscal Year of the Final Distribution and all other accounting periods of the Company, such that the Capital Account of each Member prior to the Final Distribution equals (to the fullest extent possible) the distribution to be received by such Member pursuant to the Final Distribution.

(b) Following dissolution, the Company shall pay or make reasonable provision to pay all claims and obligations known to the Company, including all contingent, conditional or unmatured claims and obligations, and all claims and obligations for which the identity of the claimant is unknown. If there are sufficient assets, such claims and obligations shall be paid in full and any such provision for payment made shall be made in full. If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefor. Any remaining assets shall be distributed as provided in subsection (a)(iii). Any Liquidator winding up the affairs of the Company who has complied with this section shall not be personally liable to the claimants of the dissolved Company by reason of such person's actions in winding up the Company.

Section 10.5 **Cancellation of Certificate**. The Certificate of the Company shall be cancelled upon the dissolution and the completion of winding up of the Company.

## ARTICLE 11

## BOOKS; REPORTS TO MEMBERS; TAX ELECTIONS

Section 11.1 **Books and Records**.

(a) The Manager shall maintain the books of account for the Company.

(b) Except as and until otherwise required by the Code, the books of the Company shall be kept in accordance with the accrual method of accounting.

(c) The Company may maintain its records in other than a written form if such form is capable of conversion into written form within a reasonable time.

(d) Any demand by a Member under this section shall be in writing and shall state the purpose of such demand.

Section 11.2 **Tax Information**. At the Company's expense, the Manager will cause the tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Company shall use commercially reasonable efforts to supply to each Member, within one hundred (120) days after the end of each Fiscal Year, all information necessary and appropriate to be included in each Member's income tax returns for that year.

Section 11.3 **Partnership Tax Representative**. The Company's "partnership representative" under Code Section 6223 (the "**Partnership Tax Representative**") for purposes of the Audit Rules shall be William Caragol. A replacement or successor Partnership Tax Representative may be appointed by the Manager. The Partnership Tax Representative shall have the powers and responsibilities provided in Section 6221 *et seq*. of the Code and the Regulations thereunder. The Company shall indemnify and

reimburse the Partnership Tax Representative for all expenses (including legal and accounting fees) incurred in its capacity as Partnership Tax Representative. This Section 11.3 shall survive the termination, winding up and dissolution of the Company and shall be binding on any Member that ceases to be a Member in the Company for any reason whatsoever.

Section 11.4 **Tax Elections**. Subject to Section 1.7, the Manager may cause the Company to make any tax election it deems appropriate, in its sole discretion.

## ARTICLE 12

## CONFIDENTIALITY OF CERTAIN INFORMATION

Section 12.1 **Maintenance of Confidentiality**. Each of the Members shall, during the term of this Agreement and at all times thereafter, maintain in confidence all confidential and proprietary information and data of the Company, and of the other Members or their Affiliates, (each, a "**Disclosing Party**") disclosed to it. Each of the Members further agrees that it shall not use the Confidential Information during the Term or at any time thereafter for any purpose other than the performance of its obligations or the exercise of its rights under this Agreement. The Company and each Member shall take all reasonable measures necessary to prevent any unauthorized disclosure of the Confidential Information by any of their employees, agents or consultants. Each Member agrees that in the event he/she/it becomes aware of any unauthorized disclosure of the Confidential Information, he/she/it will promptly notify the Company in writing.

Section 12.2 **Permitted Disclosures**. Nothing herein shall prevent the Company, any Member, or any employee, agent or consultant of the Company or any Member (the "**Receiving Party**") from using, disclosing, or authorizing the disclosure of any information it receives in the course of the business of the Company which:

(a) becomes publicly available other than through default hereunder by the Receiving Party;

(b) is lawfully acquired by the Receiving Party from a source not under any obligation to the Disclosing Party regarding disclosure of such information;

(c) is in the possession of the Receiving Party in written or other recorded form at the time of its disclosure; or

(d) is non-confidentially disclosed to any third party by or with the permission of the Disclosing Party.

## ARTICLE 13

## MISCELLANEOUS

Section 13.1 **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. The successor of a Member shall succeed to the right of the Member to receive allocations and Distributions hereunder, and may be admitted as a Member in accordance with the provisions of ARTICLE 9, but shall not be deemed a Member, and shall not be entitled to voting rights hereunder, unless and until so admitted.

Section 13.2 **Entire Agreement**. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior understandings and agreements of the parties with respect thereto.

Section 13.3 **Amendments**. The Certificate and this Agreement may not be amended except by the written agreement of a Majority in Interest.

Section 13.4 **Choice of Law**. Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware (without regard to any conflicts of law principles.) Each of the Members hereby expressly submits itself generally and unconditionally to the personal jurisdiction of any U.S. or state court which would have jurisdiction over the subject matter of an action to enforce any or all of the terms of this Agreement or to recover damages for a breach of any of its provisions.

Section 13.5 **Notices**. Except as otherwise provided in this Agreement, any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally or sent by email or facsimile transmission (with answer back received) or one day following deposit with an overnight express carrier (and, if the Member is not an individual, to the attention of an executive officer or Person holding a similar title with a Member), five days after deposit in the U.S. mail, if sent by registered or certified mail, postage and charges prepaid, in each case addressed to the Member's address set forth on the signature page of this Agreement executed by such Member and to the Company at its principal place of business, or at such other address as a party may direct in writing by notice to the Company in accordance with this Section 13.5.

Section 13.6 **Tax Advice**. It is each Member's sole responsibility to comply with all applicable tax law, regulations and requirements. Each Member understands that such Member may suffer adverse tax consequences as a result of the Member's receipt, sale, transfer or disposition of the Units. Therefore, each Member hereby represents that it (i) has consulted its tax advisor and has had the opportunity to consult with a tax advisor that the Member deems advisable in connection with the grant, award, issuance, receipt, sale, transfer or disposition of its Units, and (ii) is not relying on the Company or its Affiliates, or the Company's outside counsel, for any tax advice. Each Member hereby assumes all responsibility for the tax consequences related to the Units, including filing any such election referred to in any membership documents and paying any and all taxes or charges resulting from such election or from any failure to file the election and paying taxes or charges resulting from the grant, award, issuance, receipt, sale, transfer or other disposition of the Units.

Section 13.7 **Headings**. The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing the terms and provisions of this Agreement.

Section 13.8 **Pronouns**. All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons, firm or corporation may require in the contest thereof.

Section 13.9 **Waivers**. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, that would have originally constituted a violation, from having the effect of an original violation.

Section 13.10 **Severability**. If any provision of this Agreement or its application to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and its application shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 13.11 **Publicity**. No press release or other public announcement related to this Agreement or the Company or the transactions contemplated hereby shall be issued by any Member without the prior approval of the Manager.

Section 13.12 **No Third Party Beneficiaries**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any Person other than the parties to this Agreement and their respective successors and assigns.

Section 13.13 **Interpretation**. It is the intention of the Members that, during the term of this Agreement, the rights of the Members and their successors-in-interest shall be governed by the terms of this Agreement, and that the right of any Member or successor-in-interest to assign, transfer, sell or otherwise dispose of any interest in the Company shall be subject to limitations and restrictions of this Agreement.

Section 13.14 **Further Assurances**. Each Member shall execute all such certificates and other documents and shall do all such other acts as the Manager deems appropriate to comply with (a) the requirements of law for the formation of the Company, (b) any laws, rules, regulations and third-party requests relating to the acquisition, operation or holding of the property of the Company, or (c) the intent and purposes of this Agreement.

Section 13.15 **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

HAWAIIAN SPRINGS, LLC

By: ______________________________
HSW Holdings Corporation
Manager

IN WITNESS WHEREOF, the undersigned Member, intending to be legally bound, has executed this Agreement as of the date first above written.

HSW Holdings Corporation
Address: 6357 NW 33rd Ave.
Boca Raton, FL 33496

Lew I. Cohen
Address:

IN WITNESS WHEREOF, the undersigned Member, intending to be legally bound, has executed this Agreement as of the date first above written.

______________________________
HSW Holdings Corporation
Address:

[signature]
______________________________
Lew I. Cohen
Address: 35 Alta Sierra Dr
[illegible] CA [illegible]

EXHIBIT A

DEFINED TERMS

"**Affiliate**" means any entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with a party hereto. "**Control**" (including, with correlative meanings, the terms "controlled by" and "under common control with") means the ownership or control of securities possessing at least 50% of the voting power of all outstanding voting securities of an entity or the power to otherwise direct or cause the direction of the management and policies of such entity, whether through the ownership of voting stock or similar rights. For the purposes of this definition, partnerships, joint ventures or similar entities, a majority-in-interest of whose partners, venturers or other owners is a party hereto and/or an Affiliate of a party hereto, shall be deemed to be Affiliates of such party.

"**Audit Rules**" means Subchapter C of Chapter 63 of the Code (sections 6221 through 6241 of the Code), as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any substantially equivalent provisions for state, local or non-U.S. tax purposes (including, for the avoidance of doubt and without limitation, a state, local or non-U.S. tax provision providing for a tax matters partner or similar provision).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the Fair Market Value of any property (other than cash) contributed to the Company by such Member (net of any Member liabilities secured by such property or assumed by the Company pursuant to such transfer) or attributable to a Membership Interest transferred to such Member (whether or not for consideration).

"**Capital Transaction**" means the sale, exchange, condemnation (or similar eminent domain taking), receipt of casualty insurance proceeds (excluding any business interruption insurance proceeds) or other disposition of all or a material portion of the Company's property other than in the ordinary course of business or incurrence of indebtedness other than to finance operations (including capital expenditures) of the Company. Capital Transactions shall also encompass any mergers, consolidations, or conversions of the Company pursuant to which the Company or its Members are to receive cash or property.

"**Capital Transaction Proceeds**" means (a) any and all proceeds (whether in the form of cash or property) received by the Company from a Capital Transaction, reduced by expenses incurred by the Company in connection with such Capital Transaction, liabilities of the Company which are repaid out of the proceeds from such Capital Transaction, and such reserves as the Manager may reasonably determine to be necessary for the needs of the Company, and (b) all receipts (net of disbursements and reserves established by the Manager) of the Company after the date of any Dissolution Event, to the extent not otherwise includible in Capital Transaction Proceeds.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Confidential Information**" means information and documents of trade secret or proprietary and confidential nature to the Company, including, but not limited to, software, technical data, documentation, reports, manuals, marketing strategies, proposals, information regarding customers and customer contacts, and other confidential and proprietary information.

"**Distribution**" means, with respect to any Member, the amount of money, and the Fair Market Value of any property other than money, distributed to such Member by the Company (net of associated liabilities assumed by such Member).

"**Fiscal Period**" means the last day of each fiscal year of the Company or such other date determined by the Manager, in its sole and absolute discretion, as appropriate for an interim closing of the Company's books.

"**Fiscal Year**" means the calendar year.

"**IRS**" means the Internal Revenue Service.

"**Majority in Interest**" means Members holding an aggregate Percentage Interest of at least 50.1%.

"**Manager**" means HSW Holdings Corporation.

"**Member**" means a Person designated as the record owner of a Unit in Exhibit B, but solely in the Person's capacity as a record owner of such Unit.

"**Membership Interest**" means a Member's entire interest in the Company including the Member's the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

"**Money**" means cash or other legal tender of the United States, or any object that is immediately reducible to legal tender without delay or discount. Money shall be considered to have a Fair Market Value equal to its face amount.

"**Net Cash Flow**" means the amount determined by the Manager in accordance with the following principles: Net Cash Flow during any period shall be the excess, if any, of (a) the sum of (1) the gross receipts of the Company (as determined in accordance with the cash receipts and disbursements method of accounting) during such period, but without regard to any amounts received by the Company on the sale or other disposition of all or substantially all of its assets, (2) all amounts contributed to the Company during such period by any Member, and (3) any amounts released during such period by the Manager from any reserve maintained by the Company, over (b) the sum of (1) all expenditures of the Company (as determined under the aforesaid method of accounting) during such period, (2) all amounts applied during such period in payment of interest or principal on any borrowing of the Company, and (3) any amount added during such period by the Manager to reserves. Releases and additions to the reserves described in this definition shall be made by the Manager.

"**Partner Nonrecourse Debt**" has the same meaning as "partner nonrecourse debt" as set forth in Regulations Section 1.704-2(b)(4) and the term "**Partner Nonrecourse Debt Minimum Gain**" has the same meaning as "partner nonrecourse debt minimum gain" as set forth in Regulations Section 1.704-2(i)(2).

"**Partnership Minimum Gain**" shall have the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"**Percentage Interest**" means, subject to the terms and conditions of this Agreement, with respect to any Member as of any date, the ratio (expressed as a percentage) that the number of Units of which the Member is the record owner on such date bears to the aggregate number of issued and outstanding Units. The Percentage Interest of each Member immediately after March 31, 2021 is set forth in Exhibit B hereto. Percentage Interests shall be amended from time to time by the Manager to reflect changes in the number of issued and outstanding Units of the Company.

"**Person**" means any individual or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person as the context may require.

"**Property**" means any property, real or personal, tangible or intangible, including Money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

"**Regulations**" means the income tax regulations promulgated under the Code, as may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Units**" means the units of membership allocated to each Member, as initially set forth on Exhibit B hereto, which units represent such Member's Membership Interest in the Company. When a new Member is admitted or an existing Member contributes additional capital to the Company, such Member shall be granted new Units in accordance with ARTICLE 6.

Other Definitions. As used in this Agreement, certain additional terms shall have the respective meanings as specified in the Agreement.

March 30, 2021
EXHIBIT B

CAPITALIZATION TABLE

| Name and Address | Capital Contributions | Number of Units | Percentage Interest | Capital Account Balance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| Lew I. Cohen | $1,565,000 | 60 | 60% | $1,565,000 |
| | | | | |
| HSW Holdings Corporation | $705,000 | 40 | 40% | $705,000 |
| | | | | |
| | | | | |
| | | | | |
| Total | | | 100% | |

**EXHIBIT 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. Civil Action No. 1:24-cv-00149

**LEONITE FUND I, LP**,

Plaintiff,

v.

**HAWAIIAN SPRINGS, LLC** and **HSW HOLDINGS CORPORATION,**

Defendants.

**AMENDED COMPLAINT**

Plaintiff Leonite Fund I, LP, by and through its undersigned counsel, submits this Amended Complaint against Hawaiian Springs, LLC and HSW Holdings Corporation (the "Defendants," or "Hawaiian Springs").

**PARTIES, JURISDICTION, AND VENUE**

1. Leonite Fund I, LP ("Leonite") is a limited partnership with a principal place of business in Spring Valley, New York.

2. Leonite's sole general partner is Leonite Advisors LLC.

3. Leonite Advisors LLC has three individual members who reside in New York and New Jersey.

4. Leonite Advisors LLC is authorized to do business in the State of Colorado, as a foreign limited partnership, and has been so authorized since on or about August 4, 2021 (Colorado Secretary of State ID Number 20211721587).

5. Hawaiian Springs LLC ("HSLLC") is a limited liability company with its principal place of business in Hawaii.

6. Hawaiian Springs LLC has two members, one of which resides in California and the other is HSW Holdings Corporation.

7. HSW Holdings Corporation is a corporation with its principal place of business located in Hawaii.

8. Subject matter jurisdiction is proper in that all plaintiffs are citizens of different states than the defendant and the matter in controversy exceeds the sum or value of $75,000.

9. Personal jurisdiction is proper in Colorado against Defendants because the Defendants sell products in Colorado and because the Receiver proposed, and voluntarily agreed to, by all parties is an individual who resides in Colorado.

10. Venue is proper in this forum pursuant to 28 U.S.C.A. § 1391(b) because the proposed Receiver is a citizen of Colorado who resides in Colorado.

11. Furthermore, on January 1, 2024, the parties agreed to be governed by the laws of the State of Colorado and to venue in state and federal courts located in Colorado. *See* Exhibit E, incorporated herein by reference.

## GENERAL ALLEGATIONS

12. HSLLC is a producer of premier bottled water products.

13. HSLLC's business operations are located on a parcel of land of approximately seven acres, located at 16-305 Volcano Road, Kea'au, Hawaii.

14. HSLLC leases the land (the "Leased premises") pursuant to a lease agreement between HSLLC and Hawaii Brewery Development Co., Inc. ("HBDC").

15. HSW is a holding company which owns a percentage of the issued and outstanding shares of HSLLC and is the Manager of HSLLC.

16. Leonite Fund I, LP loaned money to HSLLC and HSW (the "Borrowers"), as evidenced by a Senior Secured Promissory Note (the "Promissory Note") with Leonite as Holder, and as amended by a First Amendment to Senior Secured Convertible Promissory Note, dated March 20, 2023 (the "First Amendment"), and a Pledge and Security Agreement, dated September 28, 2022 (the "Security Agreement"), in which HSLLC and HSW granted Leonite a Security Interest in certain collateral.

17. The Senior Secured Promissory Note is dated September 28, 2022 and incorporated by reference. *See* Exhibit A.

18. Pursuant to the Promissory Note, Leonite is entitled to the appointment of a Receiver and consistent with its obligations, HSLLC has consented to the appointment of a Receiver. *See* Promissory Note, Exh. A, at ¶ 4.1.5.

19. The parties documented Leonite's rights in their Pledge and Security Agreement dated September 28, 2022, a copy of which is attached hereto as Exhibit B (the "Pledge and Security Agreement").

20. Leonite was granted a security interest in all of HSLLC's collateral including its Lease and other contracts.

21. HSLLC is in default on the loan.

22. HSLLC is or was a defendant in a breach of contract and eviction lawsuit through which HBDC sought to evict HSLLC and to recover alleged monetary damages.

23. On or about December 13, 2023, Leonite sent a Notice of Default and Demand Letter to HSW and HSLLC, giving notice that (a) HSW and HSLLC were in default of their payment obligations under the Note for "having failed to make payment to Leonite on or before the Maturity Dates for each of the Tranches advanced to them under the Note"; (b) this constitutes an Event of Default under Section 4.1.1 of the Note; and (c) that, as of December 13, 2023, the sum of $2,254,323.58 was due and owing by Borrowers to Leonite (the "Amount Due"), and demanding that HSW and HSLLC pay the Amount Due. *See Notice of Default*, attached hereto as Exhibit F.

24. To date, HSW and HSLLC have not cured the aforementioned Event of Default because they lack sufficient assets to pay the Amount Due.

25. The Notice of Default went on to identify numerous additional Events of Default under the Note, including:

1. The breach of various Covenants by Borrowers, per Section 4.1.3 of the Promissory Note;
2. The partial cessation of operations by Borrowers, per Section 4.1.11 of the Promissory Note;
3. The Failure of Borrowers to maintain assets, per Section 4.1.12 of the Promissory Note; and
4. The breach by Borrowers of Covenants contained in Other Agreements, per Section 4.1.26 (erroneously numbered as Sec. 4.1.3) of the Promissory Note.

*See* Exhibit F.

26. Subsequent to HBDC's filing of its breach of contract and eviction lawsuit and to Leonite sending the aforesaid Notice of Default, Leonite loaned additional funds to HSLLC to bring HSLLC current on its rent and other obligations to HBDC.

27. Leonite is concerned that HSLLC will continue to default on its lease obligations to the detriment of Leonite and its collateral.

28. If HSLLC were to be evicted from the Leased Premises, HSLLC would lose its sole source of premier water and would not be able to remain in business, causing substantial damage to the creditors, investors and employees of HSLLC and HSW including Leonite.

29. The Pledge and Security Agreement entitles Leonite to the appointment of a receiver "as a matter of right" upon an event of default. *See* Pledge and Security Agreement, Exhibit B at Section 7(a)(i)(G).

30. On December 26, 2023, HSLLC agreed to the appointment of a receiver due to the financial issues and crises it is facing. *See* Exhibit C.

31. On December 26, 2023, HSW also agreed to the appointment of a receiver due to the financial issues and crises it is facing. *See* Exhibit D.

32. Without the appointment of a receiver pursuant to Fed. R. Civ. P. 66 and C.R.S. 38-38-602(3), the interests of Leonite and other creditors are in dire jeopardy.

33. On January 1, 2024, the parties agreed to be governed by the laws of the State of Colorado and to venue in state and federal courts located in Colorado. *See* Exhibit E, incorporated herein by reference.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

34. Leonite incorporates by reference all prior allegations as though fully set forth herein.

35. The Note is a valid, enforceable contract pursuant to which, among other things, HSLLC was obligated to pay to Leonite principal and interest payments, as well as all payments, fees, penalties, and other charges, if any, due under the Note no later than the Maturity Date, as that term is defined in the Note (the "Payments"). *See* Exhibit A to the Complaint at Article I.

36. Leonite has performed its obligations under the Note and Security Agreement.

37. Despite a contractual obligation to do so, HSLLC has failed to fulfill its obligations under the Note, including failure to make the Payments required by the Note.

38. HSLLC's failure to perform the contractual obligations constitutes a material breach of the Note.

39. As a direct and proximate result of HSLLC's material breach of the Note, Leonite has sustained damages in an amount to be determined at trial.

40. All conditions precedent to the filing of this lawsuit have been performed or have occurred.

**SECOND CLAIM FOR RELIEF**
**(Appointment of a Receiver)**

41. Leonite incorporates by reference all prior allegations as though fully set forth herein.

42. The Collateral securing Leonite's loan is of a nature to require the appointment of a receiver to carry out the intent and purpose of the Security Agreement and Loan Documents, in order that the Collateral will not be lost, misappropriated, or misused, and so that its value will not be diminished.

43. Borrowers agreed to the appointment of a receiver as set forth in the Unanimous Written Consents of the Members and Sole Manager of Hawaiian Springs, LLC, as well as in the Promissory Note and in the Pledge and Security Agreement.

44. Pursuant to the agreements of the parties described above, applicable federal and Colorado law, Leonite seeks the appointment of a receiver by appropriate Motion in this action, to serve as Receiver of the Collateral.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Leonite Fund I, LP respectfully requests that this Court enter judgment for Plaintiff and against Defendants HSLLC and HSW, and award Plaintiff the following relief:

a) Compensatory damages sustained by Plaintiff as a result of HSLLC's breach of the Note;
b) Consequential and special damages caused by HSLLC's breach of the Note;
c) Pre- and post-judgment interest at the maximum rates permitted under applicable law;
d) All costs recoverable under law;
e) The continuance of the Court's February 1, 2024 Order Appointing Receiver at Docket No. 18;

and

f) All such other and further relief to which Plaintiff may be entitled, or which this Court deems just and proper.

Plaintiff's Address:

1 Hillcrest Center Drive
Suite 230
Spring Valley, New York 10977

Dated: June __, 2024 Respectfully submitted,

*/s/ Aaron A. Garber*
Aaron A. Garber, #36099
WADSWORTH GARBER WARNER CONRARDY, P.C.
2580 West Main Street, Suite 200
Littleton, Colorado 80120
Telephone: (303) 296-1999
Telecopy: (303) 296-7600
agarber@wgwc-law.com

And

Zvi Raskin, Esquire
1 Hillcrest Center Drive
Suite 232
Spring Valley, New York 10977
Telephone: 845.202.0006
E-Mail: zr@raskinlegal.com

**EXHIBIT 4**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. Civil Action No. 1:24-cv-00149

**LEONITE FUND I, LP**,

Plaintiff,

v.

**HAWAIIAN SPRINGS, LLC** and **HSW HOLDINGS CORPORATION,**

Defendants.

**MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

Plaintiff Leonite Fund I, LP, by and through its undersigned counsel, submits this Motion for Leave to File Amended Complaint against Hawaiian Springs, LLC and HSW Holdings Corporation (together, the "Defendants"), and in support thereof states as follows:

**STATEMENT OF FACTS**

1. On January 8, 2024, Leonite filed its Complaint for Appointment of a Receiver (the "Complaint"), commencing the above-captioned lawsuit against HSLLC and HSW as defendants and seeking, consistent with the Unanimous Written Consents, appointment of the Receiver primarily as provided for "as a matter of right" by the Security Agreement and Note, but also pursuant to Fed. R. Civ. P. 66 and C.R.S. 38-38-602(3). Docket No. 1.

2. On January 18, 2024, Leonite filed its Motion to Appoint Receiver, requesting that the Court appoint Mr. Stevens as receiver and impose a blanket stay to prevent interference with the receivership estate pursuant to the express terms of the Security Agreement and Note, F.R.C.P. 66(a), and Colorado law. Docket No. 3.

3. On February 1, 2024, the Court entered its Order Appointing Receiver, which found, among other things, that Fed. R. Civ. P. authorizes the Court to appoint a receiver, that the parties agreed to appointment of a receiver, agreed to be bound, by Colorado law, and that Colorado law authorizes the appointment of a receiver under the circumstances present in this case, and stayed all actions against HSLLC and HSW. Docket No. 18.

4. On April 25, 2024, HBDC filed its Motion to Intervene, requesting authorization to intervene as a defendant in this action. Docket No. 26.

5. The order granting HBDC's Motion to Intervene entered on May 23, 2024. Docket No. 36.

6. On May 31, 2024, HBDC filed its Motion to Dismiss Complaint, seeking an order dismissing the claim with prejudice pursuant to Fed. R. Civ. P. 12(b), terminating the Receiver's appointment, and lifting the stay imposed on HBDC's Hawaii Litigation and any other stayed cases (the "Motion to Dismiss"). Docket No. 39.

7. On June 21, 2024, Leonite filed its Response to the Motion to Dismiss (the "Response"). As explained in the Response, given that HSLLC does not dispute that it is in default on the Note, Leonite has not to date pursued a breach of contract claim against HSLLC and HWS. Instead, Leonite has focused on protecting its collateral, including through seeking and obtaining the appointment of a receiver in accordance with the express terms of the Security Agreement and Note.

8. For the reasons stated in detail in the Response, Leonite asserts that the Complaint satisfies the pleading requirements of Fed. R. Civ. P. 8(a)(2) and adequately states a claim for appointment of a receiver.

9. In an abundance of caution, Leonite has prepared an Amended Complaint, which asserts the aforementioned breach of contract claim against HSLLC and HWS and which is attached to the Response as Exhibit 3.

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 15(a), a party may amend a pleading with consent or leave of the court. Courts are instructed to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2); *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Forman v. Davis*, 371 U.S. 178, 182 (1962). While leave to amend is within the Court's discretion, "[i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment . . . leave sought should, as the rules require, be 'freely given.'" *Id.* The Tenth Circuit recognizes a "liberal construction of rules authorizing the amendment of pleadings." *Commissioner v. Finley*, 265 F.2d 885, 888 (10th Cir. 1959). Denial of leave to amend is "generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1365 (10th Cir. 1993). There are no such grounds to refuse amendment to the Complaint.

### A. Plaintiff has Not Unduly Delayed

Rule 15(a) does not restrict a party's ability to amend its pleadings to a particular stage in an action." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006) (citing Fed. R. Civ.

P. 15(a)). But, "[a] party who delays in seeking an amendment is acting contrary to the spirit of the rule and runs the risk of the court denying permission because of the passage of time." *Id.* (internal citations omitted). The Tenth Circuit "focuses primarily on the reasons for the delay" and whether there is "adequate explanation for the delay" when determining whether denial of leave to amend is appropriate. *Id.* at 1206 (citing *Frank*, 3 F.3d at 1365-66).

Plaintiff's proposed amendment is timely and would not cause undue delay. Plaintiff filed its Complaint against HSLLC and HSW seeking appointment of the Receiver less than six months ago on January 8, 2024. This Court's Order Appointing Receiver entered on February 1, 2024. On April 25, 2024, and May 31, 2024, respectively, HBDC filed its Motion to Intervene and Motion to Dismiss. The order granting HBDC's Motion to Intervene entered less than a month ago on May 23, 2024. Plaintiff files this Motion for Leave to Amend on or before the deadline for filing a response to the Motion to Dismiss and before the entry of any scheduling order. Trial has not yet been scheduled. This Motion, and Plaintiff's proposed Amended Complaint, are timely and would not unduly delay these proceedings. Moreover, as explained above and in the Response, Plaintiff did not originally pursue its breach of contract claim against HSLLC and HSW because HSLLC does not dispute that it is in default on the Note. Accordingly, Leonite focused on protecting its collateral, including through seeking and obtaining the appointment of a receiver in accordance with the express terms of the Security Agreement and Note. Plaintiff's delay in asserting the breach of contract claim and in seeking leave to amend the Complaint was not undue or based upon an improper motive.

**B. Leave to Amend Will Not Prejudice Defendants**

Prejudice is typically found "only when the amendment unfairly affects the defendants 'in terms of preparing their defense to the amendment.'" *Minter*, 451 F.3d at 1209 (quoting *Patton v.*

*Guyer*, 443 F.2d 79, 86 (10th Cir. 1971). This is typically only the case "when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant factual issues." *Id.*

Plaintiff's breach of contract claim against HSLLC and HSW arises out of the same underlying set of facts as its claim for appointment of a receiver, indeed, the predicate facts for the proposed amendment are the same as those alleged in the Complaint. Plaintiff's original Complaint sought appointment of a receiver as a result of HSLLC's and HSW's breach of the Note and persisting inability to cure the Events of Default. By the Amended Complaint, Plaintiff merely seeks to assert the breach of contract claim already alluded to in the original Complaint and which arises from the very same facts. Plaintiff's breach of contract claim against HSLLC and HSW does not affect HBDC in any way, and most certainly will not unfairly prejudice HBDC nor inhibit HBDC's ability to prepare for a trial, which is not yet scheduled. The Amended Complaint also does not unfairly prejudice HSLLC and HSW nor inhibit their ability to prepare for a trial, as they do not dispute their breach of the note, have consented to appointment of a receiver as a result of their breach of the note, and have from the outset of the filing of the Complaint been apprised of all material aspects of this litigation.

## CONFERRAL REQUIRED BY LOCAL RULE 7.1

## CONCLUSION

WHEREFORE, pursuant to the Tenth Circuit's liberal policy towards amending pleadings, this Motion should be granted, and the Court should accept **Exhibit 1** hereto as Plaintiff's operative pleading in this lawsuit.

Dated: June __, 2024 Respectfully submitted,

*/s/ Aaron A. Garber*
Aaron A. Garber, #36099
WADSWORTH GARBER WARNER CONRARDY, P.C.
2580 West Main Street, Suite 200
Littleton, Colorado 80120
Telephone: (303) 296-1999
Telecopy: (303) 296-7600
agarber@wgwc-law.com

And

Zvi Raskin, Esquire
1 Hillcrest Center Drive
Suite 230
Spring Valley, New York 10977
Telephone: 845.202.3999
E-Mail: zr@raskinlegal.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on June __, 2024, I served by prepaid first class mail a copy of the **MOTION FOR LEAVE TO FILE AMENDED COMPLAINT** on all parties against whom relief is sought and those otherwise entitled to service at the following addresses:

[COMPLETE]

*/s/ Nichole Garber*
For Wadsworth Garber Warner Conrardy P.C.